## MERRITT E. CONKLIN ET AL. v. THOMAS BOYD.

*Easement for flowage established by prescription.*

An easement whereby water collecting upon land must be allowed to find an outlet, even though it overflows adjacent land, may be acquired by prescription; and evidence is admissible as to the length of time it has so overflowed without objection from the adjacent proprietor.

Error to Lenawee. Submitted October 8, 1880. Decided April 27, 1881.

TRESPASS. Defendants brings error. Reversed.

*C. A. & J. A. Stacy* and *Willis Merritt* for plaintiffs in error. Unlawful obstructions may be removed by any private individual injured: *Arundel v. McCulloch* 10 Mass. 70; *Williams v. Fink* 18 Wis. 265; *Clark v. Lake St. Clair Ice Co.* 24 Mich. 508; a dam not authorized by law, obstructing a public highway by water, is a nuisance *per se: In re F. S. Eldred* 46 Wis. 530; a superior owner may improve his lands by throwing increased waters upon his inferior through the natural and customary channels: *Kauffman v. Griesemer* 26 Penn. St. 407; *Martin v. Riddle* id. 415; *Miller v. Laubach* 47 Penn. St. 154; *Gillham v. Madison R. R. Co.* 49 Ill. 484; *Gormley v. Sanford* 52 Ill. 158, 160; *Ogburn v. Connor* 46 Cal. 346: 13 Amer. 213; *Acton v. Blundell* 12 M. & W. 324; *Butler v. Peck* 16 Ohio St. 334; *Tootle v. Clifton* 22 Ohio St. 247; *Mason v. Hill* 5 B. & Ad. 1; *Bellows v. Sackett* 15 Barb. 96; *Nevins v. Peoria* 41 Ill. 502; *Rudd v. Williams* 43 Ill. 385; *Laumier v. Francis* 23 Mo. 181; *Livingston v. McDonald* 21 Iowa 160;

*Hooper v. Wilkinson* 15 La. Ann. 497; *Delahoussaye v. Judice* 13 La. Ann. 587; *Earl v. De Hart* 1 Beas. Ch. 12 N. J. 283; *Eulrich v. Richter* 41 Wis. 318; Washb. Easements 355.

*Millard & Bean* for defendants in error.    The right to insist that water gathering on one's land shall be permitted to run into or through the lands of an adjoining proprietor does not lie either in the owner, or in the public: *Bates v. Smith* 100 Mass. 181; *Pettigrew v. Evansville* 25 Wis. 223; *Dickinson v. Worcester* 7 Allen 19; *Goodale v. Tuttle* 29 N. Y. 459; *Flagg v. Worcester* 13 Gray 601; Cooley on Torts 575-7; nor can any prescriptive right so to insist be acquired by the fact that the surface water has passed over the adjacent owner's land for twenty years: *Parks v. Newburyport* 10 Gray 28; *Hoyt v. Hudson* 27 Wis. 656; an owner of land may turn back the overflow of a stream as well as surface water produced by a fall of rain or snow: *Taylor v. Fickas* 64 Ind. 167: 18 Am. L. Reg. (N. S.) 249.

MARSTON, C. J.  Boyd brought an action to recover damages claimed to have been suffered by reason of a trespass committed upon his lands in removing an embankment, and thereby permitting surface water to flow over his lands into a pond or reservoir thereon, from off the highway and lands of an adjoining proprietor.

The tendency of the evidence on both sides is so briefly and clearly set forth in the bill of exceptions, that we give the material parts thereof in a note herewith.*    We also give herewith the principal portion of the instructions given the jury by the court.    (See p. 60, note †).

---

*And thereupon the counsel for the said plaintiff to maintain the issue on his part called as a witness Thomas Boyd, who, being duly sworn, gave testimony that he was the owner of the premises described in the declaration in this cause; that he was then in possession of said premises and had been since some time in the year 1873; that said premises front on the road on the north known as the La Plaisance Bay turnpike, a road running east and west or nearly so; that the lands lying north of the premises mentioned in said declaration are occupied by one Dewey; that the highway immediately north of the premises mentioned in said declaration as well as said Dewey's said land is low ground; that in times

Some very nice and interesting questions are quite likely to arise concerning the flow of surface water, and we therefore fully concur with the court below in declining to attempt to lay down any rule of universal application. Confining ourselves strictly to the facts in this case, we are of opinion that the evidence introduced on the part of the defendants tended to prove that the surface water had run from off Dewey's land over that of the plaintiff and into

of high water Evans creek lying north of said Dewey's said land and about one-half mile north of said highway would overflow, and that in connection with the rain and melting snow would flow off south towards the land mentioned in said plaintiff's declaration and fill up a pond upon said Dewey's land immediately north of said highway; that when said Dewey's pond would become filled as aforesaid, said water would further flow across said highway and upon the land of said plaintiff mentioned in said declaration into a pond or basin of water upon the land described in the declaration in this case, some thirty-five or forty rods south of said highway, and cause said last-mentioned pond to overflow a portion of the land mentioned in said declaration; that the nature of the land between said Dewey's pond on the north side of said highway and said pond upon said plaintiff's land hereinbefore mentioned, was low swampy land with the exception of a ridge four or five rods south of said highway which was higher than either of said ponds and higher than the land immediately north of said highway upon said Dewey's premises; that there was no regular water-course between said Dewey's pond immediately north of said highway and said pond hereinbefore mentioned upon said premises described in said declaration where living water usually runs, but water was only there in times of high water, and then only surface water; that for the purpose of preventing said water from settling back from Evans creek into Dewey's pond and from Dewey's pond flowing upon the land mentioned in said declaration and overflowing the same, said plaintiff caused in the fall of 1877 an embankment to be made upon the premises mentioned in said declaration immediately south of said highway and south of the fence enclosing said land on the north of about fourteen rods long east and west and twelve or fifteen feet wide; said bank extended east and west entirely across the swail or low lands over which in times of high water the water flowed into said pond upon the land described in said declaration; that the effect of said embankment was to keep off the water flowing from the highway and Dewey's land as aforesaid, thereby rendering several acres of land tillable that otherwise would not be.

The original width of the road was six rods, as appears from the examination of the maps furnished from the department at Washington. The section line runs to the south of the present culvert in that highway. The distance from the culvert of the highway to the dam where the cut was, is fifty-nine one-hundredths of a chain, to the middle of the dam fifty-six one-hundredths of a chain, to the east end of the dam forty-nine one-hundredths of a chain. The length of dam is about fourteen rods. The height of dam above natural surface of water in the Dewey pond is 3 88–100 feet. On an average (the top of the dam not being quite uniform) the top of the dam is five or six inches higher than the top of the culvert. The dam is three feet higher than the road ditch. The highway on east side of the culvert is lower than the culvert, on the east side of the culvert at least a foot lower than the bridge over the culvert. The road at the

the pond upon his land for far more than twenty years; that the plaintiff and his grantors had knowledge of such flowage for the entire period, and that work had been done in clearing and improving the highway, the channel, and no objections made thereto.

Now without attempting to lay down any rule as to the right of an owner of an upper field to have the water that falls thereon flow off upon the lands of another below, or of

culvert is four and one-half rods between the fences as they now stand. The witness also stated that he was there twice in October, 1879; once he made survey and second time the level. The water in the creek was low water then. It was a dry fall. The surface of the water in the Dewey pond was then four feet and some fraction higher than in the Boyd pond.

The defendants also introduced testimony tending to show that there had been a channel there for water, though water did not always run there, from above the place called Dewey's pond, down through that pond across the road down through the Boyd place, a regular channel above spoken of, to the Boyd pond, for more than fifty years; that a road had been laid out on the section line in 1830, and the United States road, six rods wide on section line, in 1832; that the road had been worked and grubbed out one hundred feet wide, and had been used by the public ever since as a highway, but not the full width before mentioned; that the Boyd lot was taken up from the United States land-office by Luther Rawson in 1824, was purchased by Simeon Dewey with five other lots in June, 1829, who moved his family on the land and occupied it until 1831; that Simeon Dewey sold the lot in 1831, to Eliphalet Wood, who occupied the same with his family until 1855, when it was sold by Wood to Jarvis Fuller, who occupied it with his family until he sold it to the plaintiff in April, 1873, who has owned and occupied it ever since; that the water run down the natural channel across Dewey's place and across the road and down the natural channel on the Boyd lot into the Boyd pond, the greater part of the year and in wet seasons nearly all the year; that the water consisted of surface water and of water from the springs running from the hills west of the water-course or channel, and of a spring east of the water-course or channel, and sometimes also from water flowing over the banks of Evans creek at a point nearly north of Dewey's pond in a high freshet, and running down the ravine and channel to Dewey's and Boyd's ponds; that this water has run from the first settlement of the country, more than fifty years; that the turnpike had been built nearly fifty years with a culvert or passage-way through which this water has run in times of high water as aforesaid, ever since; that the channel through Boyd's farm down to this pond had never been closed up entirely until he built the dam in 1877, though he had by plowing after his purchase filled it up a part of the way; that Eliphalet Wood, during his ownership and occupancy, had employed a Mr. Pocklington to clear out an old gully from the culvert on the highway down to the Boyd pond, and this was just after he had dug and cleared out a ditch from the culvert north-west and then running north-east on the Dewey place down the natural channel; that this had been done nearly twenty-seven years before, and the ditch cleared out and made so as to give a clear passage to the water down to Boyd's pond; that no one of the owners of the Boyd farm before Mr. Boyd, ever stopped that channel to the Boyd pond; that Mr. Boyd's first act in closing the channel so far as the evidence shows

the right of the latter, or the extent to which, in the improvement of his own lands for agricultural purposes, he can stop or prevent such flowage, we are of opinion that if the jury had found the facts to be as the defendant's testimony tended to prove, the plaintiff would not have been entitled to recover.

Whether a lower estate owes servitude to an upper or superior one in the first instance or not, we are of opinion,

---

was in the fall of 1877, when he built this dam; that when in the spring of 1878, its effect was discovered in overflowing and injuring the road, Albert Hyde, the highway commissioner of Tecumseh, cut the dam through so the water could pass into its accustomed channel, and the road was relieved of the water.

†Now it is a familiar rule that no one shall be at liberty to interrupt a natural water-course so as to set the water back upon a land proprietor above him, and for the purpose of this case, I shall instruct you that the highway authorities in their control of the highway may be considered as having the right of land proprietors and entitled to the benefit of this rule. The defendants insist that this familiar rule applies to this case and that the water-way from Dewey's land to the Boyd pond, where from the evidence there seems to be a clearly-defined channel or passage-way, is to be regarded as a natural water-course. The plaintiff, on the other hand, insists that only is a natural water-course in a legal sense where living water continually flows. For the purpose of this case I shall instruct you that if you find that living water does gather on Dewey's land from living springs or other source and flow for any considerable portion of the year in an accustomed channel along by the way of the culvert in the highway and upon the plaintiff's land, the n this is to be considered a natural water-course and defendants were justified in keeping it open by cutting open any embankment erected to obstruct it.

If you find, however, that there was no such flow of living water for any considerable portion of the year, you will next direct attention to the rights of the parties as regards the waters that occasionally gather in this water-way. As to these it is shown that they sometimes in very high water overflow from Evans creek. Of course if the water continuously or usually flowed from Evans creek in this water-way, a water-course would exist which could not rightfully be obstructed; but the overflow from high water appears to occur only in rare cases. In my opinion Mr. Boyd is not under obligation to furnish a way for this water. Rights in respect to this would be reciprocal; if Mr. Dewey has a right to insist that Boyd shall receive the water flowing along as it naturally would after the overflow, that Mr. Boyd would have a corresponding right to insist that Mr. Dewey should not shut it off and prevent its coming. If therefore Mr. Boyd desired to have the water for any purpose, as for example, in order to keep his pond supplied with fresh water for the raising of fish, he might claim damage of Mr. Dewey should the latter, by raising slightly the banks of Evans creek, prevent these occasional overflows. But this would be entirely unreasonable and therefore not sanctioned by the law. Dewey may prevent the occasional overflows upon him without being liable to Boyd, and Boyd may prevent the water from the overflows coming upon him without being liable to Dewey.

And now coming to the question of mere surface water, whether Dewey

that such an easement may be acquired by prescription, and
that the evidence bearing upon this subject should have been
submitted to the jury.    The authorities are quite fully col-
lected and discussed in Washburn on Easements 353 *et seq.*,
to which reference is made.

The judgment must be reversed with costs and a new trial
ordered.    A difficulty appears on the record, but as it was-

and the highway commissioners have a right to insist that this shall con-
tinue to flow in its accustomed way without obstruction from Boyd, I am
not disposed to attempt to lay down any rule that shall be of universal
application, but shall confine myself to the facts of this particular case.
This case in my opinion does not present the broad question of the obli-
gation of the land proprietor through whose land there is a natural water-
way for surface water, to suffer it to pass upon and through his land in,
an accustomed channel.

The case here is of a natural basin of perhaps 175 acres, 100 acres north,
of the highway and 75 acres south of it, within which the surface water
collects into the Boyd pond.    Now there is no outlet to this pond, and the
land south and between it and the river is considerably higher than in
this basin; there is therefore no natural course for the flow of surface-
water through Boyd's place upon the land south of him and off towards.
any stream of water, but only a natural course for the flow of water upon
his place, so that the question is not whether he shall allow a natural
passage for the flow of surface water through his premises to be kept
open, but whether he shall against his will receive the surface water from.
the lands above him into his pond as a natural place of deposit.

Now I think it is manifest from the evidence that the Boyd pond is to·
some extent filling up.    This would be the natural consequence of its
receiving the wash of 175 acres of cultivated land, and the evidence shows
that the bottom of the pond is muck.    The time will probably come,
therefore, when this lake from natural causes will disappear, but whether
this is so or not, I think Mr. Boyd, so far as it is fed by mere surface
water, has a right to get rid of it if he can.    It is now small or large
according to the flow of water into it, but I think he has a right to get
rid of it altogether by draining it or otherwise, as he may be able to do·
without trespassing upon others.    It is no legal wrong to Mr. Dewey or
to the township if in order to do so he finds it necessary to stop the flow
of surface water into it from the north.    He is not under obligation to
keep this pond here in order that the surface water from other premises
than his own may be run into it as a reservoir, but he may bring all his
land including this under cultivation if he shall find it practicable to do·
so, and the fact that stopping the flow of the surface water into it injures
the highway by setting back water upon it is not one of any legal import-
ance in this controversy.

One further claim is made by the defendants, namely: that by reason
of Wood, when he owned the Boyd place, cleaning out this water-way on,
his land in extension of a ditch then cut by Dewey, and evidently on an
understanding between them, Dewey has acquired a right in the nature
of an easement to have the way left open.    I do not find in the evidence,
however, any proof of an understanding from which an easement would
arise or any evidence that Wood cleared out the way for anybody's bene-
fit except his own.    And the mere fact that something done by one per-
son for his own advantage proves useful to another, can confer no legal
right upon such other to its continuous enjoyment.    In a new country-

not argued by counsel and will not again arise we pass no opinion thereon.

GRAVES and CAMPBELL, JJ. concurred.

COOLEY, J. did not sit, having tried the case in the circuit as special judge.

---

people often do things which for a time are for the convenience of their neighbors, and submit to things for the benefit of neighbors which as the country improves they find it for their advantage to change, and thereby withdraw the neighborly favor, and they are entirely at liberty to do this, provided they have not precluded themselves from doing so by some legal grant or contract. And I know of no evidence of such a legal grant or contract in respect to keeping open this water-way.