## GEORGE H. CHAPEL v. CHARLES P. SMITH AND GEORGE R. PARKER.

*Easement—Diversion of water—User—Evidence.*

1. An action for consequential damages sustained by a land-owner by reason of the diversion of water onto his lands by the action of a drain commissioner in opening a tunnel and maintaining it as a public drain, which damage occurred some three years after such opening, cannot be maintained against a contractor who performed such work, no permanent damage being done to the freehold which the discontinuance of such flowage would not remove.

2. The right to discharge a drain upon the lands of another cannot be acquired by 20 years' user, unless the drain be one and the same, and the use thereof uninterrupted during the whole period (*Cotton v. Manufacturing Co.,* 13 Metc. 429);

and the measure of such right is not the dimensions of the drain, but the quantity of water discharged upon said land.

3. No one has the right, without redress, to flood the wild lands of another, or to add to the water upon them, because no present special damage can be shown.

4. A drain commissioner cannot, under the law, in laying a public drain, empty water upon the lands of another that does not belong to him, without providing a proper outlet for its passage from his premises; and if he does so he is responsible for the consequent damages. *Cubit v. O'Dett,* 51 Mich. 351; *Ashley v. Port Huron,* 35 Id. 296.

5. In a suit involving, as an issue, the consent of a land-owner to the diversion of water upon his lands, he may show all things done by him, or by others in his behalf, by way of protest or remonstrance against such diversion.

Error to Genesee. (Newton, J.) Argued January 22, 1890. Decided April 11, 1890.

Case. Plaintiff brings error. Affirmed as to Parker and reversed as to Smith. The facts are stated in the opinion.

*David P. Halsey* and *Frank B. Leland,* for appellant.
*Lee & Aitken* and *A. W. Davis,* for defendants.

[The points of counsel are stated in the opinion, where the authorities are discussed.—REPORTER.]

MORSE, J. The plaintiff sued defendants in the Genesee circuit court for damages to his premises by the opening of a tunnel through a natural embankment by reason of which a large amount of water, contrary to its natural flow, was let down upon and across his lands.

The plaintiff alleged in his declaration that he was the owner of 80 acres of land, situated in the township of Grand Blanc, in Genesee county, occupied and tilled by him for farming purposes; that in 1884 said land was properly drained by good and sufficient drains, the main

drain being laid out and constructed by the township drain commissioner of the width of 10 feet, and of the depth of 3½ feet, and that it was amply sufficient to carry away all the water which would fall upon said lands, or which would flow thereon from all other lands naturally draining upon the same.

"That about one mile east of plaintiff's said land there is a natural embankment or rise of land running north and south, which forms a barrier against all the water above and to the east of it, said embankment consisting of a hill, the lowest point of the crest of which is about 15 feet above the highest point reached by accumulations of water from above and the east at any time; that above and to the east of it, and easterly from said embankment, there is a large tract of several hundred acres of land, the drainage from which is naturally stopped by said natural embankment from flowing down upon plaintiff's said land, the water accumulating upon said tract of land situated to the east of said embankment naturally flowing off from said land in a north-easterly direction, flowing entirely away from and never touching plaintiff's said land.

"That in the spring and summer of 1884, unlawfully and wrongfully, and to the great damage of said plaintiff, defendants, by themselves, their agents, and employés, dug and opened a large tunnel, filling the same with a crock tile about 23 inches in diameter, directly under and through said embankment, being a distance of about 15 rods, which was capable of emptying, and which did empty, great volumes of water, the accumulations from said tract of land to the east of said embankment, out into a fertile valley, leading directly onto plaintiff's said land, said plaintiff's land forming a part of said valley; that the result of digging said tunnel was to cast upon plaintiff's land a large volume of water, which otherwise would not have flowed in that direction; that said tunnel did not empty into any ditch or trench, and that no means whatever were or ever had been employed to convey the water to any place beyond a few rods beyond the mouth of said tunnel; and that so great was the quantity of water which flowed through said tunnel that at certain times of the year it continued flowing constantly for several days at a time.

"That said wrong and injury had so continued from

the opening of said tunnel by defendants down to the time of the commencement of this suit; and that the consequence of the digging and constructing said tunnel by said defendants was to do away with said natural barrier to the water formed by said embankment, and to cause a large quantity of water to flow down upon plaintiff's said land which otherwise would not have done so, bringing with it pieces of wood and brush and other refuse. "That the water and refuse flowing and deposited upon plaintiff's said land had destroyed the crops on from 12 to 15 acres thereof for several years, and that the land had been permanently injured thereby, and the crops destroyed, to the great damage of said plaintiff."

Another count charges that the depositing of said drift-wood has created an intolerable public nuisance, and has caused, by said coming down of water and drift-wood, whenever the same comes down upon his premises, an intolerable and unhealthy stench, which fills the air with malaria and impurities, and endangers the health of plaintiff and his family, and that of his neighbors in the vicinity, and which stench is an intolerable and public nuisance; and also that said land has already been permanently injured thereby, and plaintiff's ditches filled up and permanently obstructed by said refuse and sand, and the water standing on said land has caused it a permanent injury.

The defendants pleaded the general issue, and gave notice under such plea that they would prove that the tunnel complained of had been in continuous existence for more than 15 years previous to the time that the defendants in the declaration are alleged to have constructed it, and that it was originally built and maintained by the Flint & Holly Railroad Company and the citizens of Grand Blanc in that vicinity, and the public had a right thereto, and a public drain called the "Seaver Ditch" or "Cook Drain No. 2" was constructed

years ago to furnish an outlet for the water passing through it.

That at the time the work complained of was done defendant Smith was drain commissioner of Grand Blanc, and was acting as such commissioner, and by virtue of proceedings instituted under the drain law, by a petition signed by 25 freeholders of said township, and that the work was performed as a public improvement legally instituted upon said petition, and on proceedings, based thereon, by said Smith as drain commissioner, who had established said tunnel and made it a part of the drain prayed for in said petition, and which was established by said commissioner after the necessity therefor had been determined, not only by him, but by special commissioners appointed by the probate court of Genesee county; that the said tunnel is a part of the "Parsons Drain," so known and established, and is now a public township drain; and that Smith, in cleaning out said tunnel and putting crocks therein, instead of the plank then in said drain, only did his duty, and did not increase the flow of water therein.

That other public drains carry large volumes of water onto plaintiff's land, and, if he has been damaged, such damage has been occasioned by his own negligence in not constructing or procuring a proper and sufficient outlet for said water; that the water, after leaving said tunnel, passes into a public drain, and in said drain through a level fertile valley, for more than a mile, before it reaches plaintiff's land, and flows over plaintiff's premises through a public water-course,—a township or county drain,—made to receive it more than 15 years before this suit was brought, and that the defendants and the public generally have acquired a right to have the water flow therein; and that the defendant Parker had nothing to

do with the work, except to lay the crocks and clean out the tunnel under contract.

Upon this issue a large amount of testimony, reaching back more than 40 years, was taken, at the close of which the circuit judge directed a verdict for the defendants, upon the ground that there was a public drain where the waters coming through from this tunnel where discharged, which had existed for over 20 years, and that the tunnel was part of said drain; and that Smith, acting as drain commissioner, and Parker, taking the contract under him, were justified in what they did.

It is claimed by the plaintiff that he had a right to go to the jury on several propositions of fact in the case. The testimony shows that, in a state of nature, the land now occupied by plaintiff, or the portion claimed to be injured, as well as much of the land in his immediate vicinity, was a willow swamp, with some tamaracks growing therein. East of the point where this tunnel was constructed was a marsh. This marsh was a mile or so east of the plaintiff's land, and upon land taken up and now owned by Edward Parsons. Upon the west side of this marsh was a high ridge of hard land, called a "hog-back." The natural flow of the water upon this marsh was to the north and east, and away from plaintiff's land. But upon the west side of the hog-back, and lower than the marsh on the east side, and upon the land of Mr. Parsons, was low, wet, and swampy land, part marsh and black ash swale, forming a depression or valley, running towards and upon plaintiff's land, the surplus waters of which ran through this depression down into a creek or well-defined water-course below plaintiff's land. Plaintiff purchased his land in 1877, and has since been living upon it.

The plaintiff himself testifies, and it is also established by other testimony, that in 1878 he, with others, called

out the drain commissioners, and had a "big ditch," 10 feet wide and 3½ feet deep, put through this valley. This ditch ran back towards the ridge, within from 20 to 100 rods of the tunnel, and it crossed the plaintiff's land. He swears that there were evidences of an old ditch there at that time,—"a narrow ditch, nearly filled up." One of his witnesses, Thomas Pollock, testifies that this old ditch was laid in 1863, and crossed plaintiff's land, and also went up to within 20 rods of the tunnel, and that it was called the Seaver ditch, and was a small ditch. The work in 1878 seems to have been a clearing out, enlarging, and straightening of this old ditch, and since then it has been kept open and maintained as a public drain.

The plaintiff's own witnesses also establish the fact that a tunnel was opened through this ridge or hog-back as early as 1866. This tunnel was constructed by the Flint & Holly Railroad Company, who put a box or plank drain through in the same place where the defendants committed the alleged wrong against plaintiff. Pollock also testifies, and there seems to be no doubt of it from other testimony, that, in 1862, Parsons, who owned the land on both sides of the ridge, put a small blind ditch through the hog-back, which let some water through from the eastern upon the western marsh, and into the valley below. This ditch, however, was not where the tunnel now is, but some rods from it. The drain put in by the railroad company rotted, and then they put in a triangular box-drain. This last drain began to cave in in 1881, and in 1883 or 1884, about the time of the action of defendants, had fallen in so that no water ran through the box-drain. The capacity of this tunnel from 1866 to 1881, from testimony given by plaintiff's witnesses, seems to have been as great for carrying off water as it has been since the crocks were put in. This testimony

shows, also, that the flow of water upon plaintiff's land
has increased latterly year by year. This is partially
accounted for by the fact that the area of ground drained
by the tunnel has been increased by parties east of the
ridge draining their lands into the eastern marsh. It
also appears that in the years most complained of by
plaintiff the damage was caused by heavy and unusual
freshets. It also appears that at the particular time the
crocks were put in by Smith and Parker the water had
washed a hole through the ridge where this box tunnel
had been, and that such hole was capable of discharging
more water in a given time than the tunnel as now con-
structed. The reason of Smith's action as to this drain
seems to have been this:

In 1856 a plank road was built across this eastern
marsh. This highway was never overflowed until 1866,
or about the time the Flint & Holly Railroad was built
across the same marsh to the east of the highway. The
railroad company put a culvert under its embankment,
and its ditches let more water down towards the highway,
the lowest part of the marsh being near the place where
the tunnel is. The tunnel was originally constructed by
the railroad company to relieve the highway. There was
some talk at the time about injury to the lower proprie-
tors, and the railroad company wanted the township board
to indemnify it against liability for such damage, but
what was done in this regard does not clearly appear, nor
is it material. In 1883 and 1884 the highway was over-
flowed, and Smith was called upon as drain commissioner
to open a public drain through the tunnel.

No documentary evidence was given on the trial as to
the proceedings, but, without objection, both sides went
into the matter, and it appears that the probate court,
the parties interested appearing by counsel, Judge Long
acting for the people below the tunnel, appointed three

special commissioners, who determined the necessity of this drain, and that the tunnel was cleaned out, and a 20-inch crock put in.

I cannot see how this action can be maintained against the defendant Parker. He was employed by, and acted entirely under the direction of, the defendant Smith. The act of cleaning out the tunnel or the putting in of the crocks was not a direct trespass as against plaintiff, and no consequential wrong or injury was occasioned him thereby until nearly a year afterwards, and that so slight that he made no particular note of it. The tunnel was on the lands of Parsons, and the injury to plaintiff of which he complains was not the immediate result of Parker's work, but has rather been caused by the subsequent maintenance of this tunnel. It appears from plaintiff's own testimony that he was first injured by this tunnel in 1880, four years before the putting in of the crocks. There was a heavy freshet that year. The tunnel was dug out by Parker in June or July, 1884. In regard to the damage that year, plaintiff testifies:

"Q. What damage did you sustain that year after the digging out of the tunnel?

"A. Some, but not so much as I have other years. The tunnel was not dug out, if I remember right, when the spring rains came; but there was something on the flat that damaged some, but not so much, that year.

"Q. The different years since 1884,—just take it along by the year, and state about how much, in your opinion, you have been damaged by this overflow.

"A. I can hardly state; some years it would not amount to a great deal, There has not been so very much until last year" (1887).

He further states that his damage was the greatest in 1887, and next to it was the year 1880. The testimony of all the witnesses shows that there were unprecedented floods or freshets in both of these years. One witness swears that Chapel had from three to five acres of corn

ruined in 1884, and that some 15 or 18 acres of his land was overflowed, but this was before the crocks were put in, and in the spring. His son also testified to damage done to hay and corn in the spring of 1884, but he gives no damage happening that year after Parker's work, and his father, the plaintiff, when brought upon the stand afterwards, was asked on cross-examination, and testified, as follows:

"*Q.* How much were you damaged in 1884, the spring when that big freshet was?

"*A.* Well, sir, if I remember right, the tunnel was stopped after it caved in until the freshet was over.

"*Q.* Your boy said there was 12 or 15 acres overflowed in the spring.

"*A.* I hardly think he said that.

"*Q.* Will you swear he didn't?

"*A.* No; I wouldn't swear he didn't.

"*Q.* Will you swear there was not 15 acres overflowed on that place in the spring of 1884?

"*A.* I don't remember that there has been a spring when the water comes down from above but what it overflows,—did this year.

"*Q.* Always been 15 acres overflowed?

"*A.* Somewhere; not quite as much as last year.

"*Q.* How much was overflowed in 1883?

"*A.* I have not got any damage for 1883. I didn't look to find out what the damage was in 1883.

"*Q.* What was it in 1882?

"*A.* I had oats over on the south side, and there was that patch I spoke of that was killed out again. That same patch has been killed out pretty nearly every year since 1880. We have been flooded from two to three times a year. We had a flood this spring.

"*Q.* Did you ever since you have lived there see such a flood as there was last spring?

"*A.* I never knew it to come down so quick, hardly. It came down very much quicker than it used to.

"*Q.* Did you ever see it rain as hard?

"*A.* For a little while it did rain pretty hard, but not a great while.

"*Q.* Did you ever see it rain as hard before?

"*A.* I don't know."

At this time he further stated that he suffered some damage in 1885 and 1886, but that he had only stated two different damages in 1880 and 1887, when everything was killed out. There was no testimony whatever of any damage in the year 1884, after the work complained of by Smith and Parker was done. This tunnel has not been maintained by Parker since 1884, and he has no authority over it, or any dominion over the soil in which it is planted. The labor he did in cleaning it out and putting the crocks in was that of a contractor or hired man. He has not done anything since towards keeping it there, and has had no right to meddle with it in any way. By what rule of law is he to be held responsible for the damage done by it in 1887, the year for which plaintiff seeks to recover, or even for the damage done in 1885 or 1886, if any? If he can be held for these years, he can be held indefinitely, when he has no power or right to close this tunnel. Somebody may be maintaining it, but Parker is not responsible for it. If Parker had placed the tunnel upon his own land, and had power and dominion over it, so that he could maintain it or abate it as he chose, then I could see some reason and some theory in the law by which he could be held responsible for the damages occasioned by it, but I confess, as it is, I can see none.

In my opinion, no cause of action was shown against Parker. No evidence was given of any permanent damage to the freehold which the discontinuance of the flowing would not relieve, as in the case of *Cubit v. O'Dett,* 51 Mich. 348 (16 N. W. Rep. 679). Here the only damages claimed were for injury to crops caused by the overflow during certain years, more especially for 1887, three years after the crocks were put in this tunnel. It was, however, said in that case, at page 350:

" The existing ditch might be obstructed without going

upon the plaintiff's land for the purpose, but as it is not upon the land of the defendants, *and they are doing nothing, so far as we know, to keep it open, there may be question whether they are liable from day to day,* as a man may be who maintains a nuisance on his own premises."

In Smith's case he was still drain commissioner at the time this suit was brought, and had been such officer ever since the crocks were put in. There is no doubt, from the whole evidence, that he was acting as drain commissioner when he ordered the work done. If his action was not legal and was wrongful as against plaintiff, he must be held responsible for what damage has been done him. He has had charge of this tunnel, as such drain commissioner, and must be considered as the person maintaining it.

The circuit judge should have submitted to the jury the question whether more water flowed upon plaintiff's land after the work of Smith than before. It is true I think, as heretofore stated, that it was practically undisputed from the whole testimony that the capacity of the crocks was not greater than that of the box-drains for carrying water through this tunnel; in other words, as much water could have run through the box-drains as through the crocks; and it is also true, I think, that the increase of water flowing through the tunnel, and upon plaintiff, is mainly, if not entirely, due to the fact that cat-holes and other wet places above the tunnel have been drained into this eastern marsh. But while Smith may not have increased the capacity of and did not enlarge this tunnel, when we come to the prescriptive right claimed by defendants to flow plaintiff's land by the maintenance of this tunnel we must remember that the measure of such right is not the dimension of the tunnel, but the quantity of water taken down upon his premises by it. *Turner v. Hart,* 71 Mich. 128 (38 N. W. Rep. 890).

That a prescriptive right to flow this water upon plaintiff's land could be acquired by 20 years of adverse user seems to be settled in this State. *Conklin v. Boyd*, 46 Mich. 56 (9 N. W. Rep. 134); *Gregory v. Bush*, 64 Id. 37 (31 N. W. Rep. 90). But, like any other right gained by adverse user, it must be limited by the extent of the user, and the right to discharge a drain upon the lands of another cannot be acquired by 20 years' user, unless the drain be one and the same, and the use thereof uninterrupted during the whole period. *Cotton v. Manufacturing Co.*, 13 Metc. 429. Therefore the drain or blind ditch put in by Parsons does not count at all, and is of no importance in this case.

The tunnel builded by the railroad company in 1866 was put in without right, and there is testimony tending to show that in 1883 and 1884, if not before, the same had got out of repair and fallen into disuse. If this should, upon another trial of this case, be found to be a fact, the question of adverse user would be out of the case, and the only matter to be determined would be the lawfulness of Smith's action in the premises, and, if unlawful, the damages resulting therefrom. It must be conceded that by this tunnel the water was diverted from its natural flow and thrown upon plaintiff's land without right. The circuit judge thought, and so held, that this tunnel, having discharged the waters of this eastern marsh into the Seaver drain, which had existed for more than 20 years, the plaintiff could not now dispute the right which had grown up by adverse user. In this he was in error. The question of adverse user should have been submitted to the jury. If there was no drain there when Smith put the crocks in,—if the railroad company had abandoned it, or it had fallen into disuse for any length of time,—the continuity of the use had been broken, and Smith must be considered as responsible, the

same as if no tunnel had ever existed through this ridge. If the tunnel had been continuously maintained by the railroad company since 1866, then it was for the jury to determine whether, since the intermeddling of Smith, the flow of water had been increased upon plaintiff's land.

Plaintiff's counsel claim that no prescriptive right to maintain this tunnel is shown, because Chapel could not complain of it until some special damage had been done him; that the land being wild and unoccupied, and a willow swamp, until 1877 or 1878, and no special damage accruing to him until 1880, the adverse use of this tunnel did not commence until then; that the injury not being direct, but consequential, his right of action must be founded upon special damage, and the bar against such right could not commence to run until some special damage was occasioned by the tunnel. We think the plaintiff or his grantors had a right of action when the tunnel was first put through this ridge by the railroad company, if by such tunnel any water was diverted from its natural flow, and thereby thrown upon his premises, no matter what was then the condition of his lands. Though entitled only to nominal damages, the right of action would exist. And no one would have the right, without redress, to flood the wild lands of another, or to add to the water upon them, because no present special damage could be shown.

But plaintiff's counsel are correct in their further claim that the—

"Right obtained by prescription is commensurate only with the right enjoyed, and that the extent of the enjoyment measures the right, and the privilege cannot be enlarged to the prejudice of another. Every increase in the volume of water turned upon the lower proprietors creates a new cause of action."

It follows, therefore, that, in any event, if by the main-

tenance of this tunnel by Smith, as drain commissioner, more water has been thrown upon plaintiff's land than has flowed through it for 20 years before, Smith is liable for the damages occasioned by such increased flowage, if the tunnel was not legally laid out as a township drain; and he may also be liable if it was laid in conformity to the statute, if thereby the plaintiff was damaged by neglect to provide him with a proper outlet of the waters thrown upon his premises. If he has wrongfully maintained it, he is liable. If the tunnel was not legally laid as a public drain, then he is certainly liable for the damage done, if any, by reason of its construction and maintenance. If it is a legal drain, and properly laid, then the question would arise whether such drain could be established and maintained to the detriment of plaintiff without his consent. The plaintiff himself swears that when Smith was putting the crocks in, or about to do so, he protested against it. Smith said to him:

" Smith says to me, after we had talked awhile, he says: ' Now, if you will just keep quiet and hold on, you fellows, I will get a couple of hundred dollars, and help you dig out the outlet from below.' The consequence was I never appeared, and supposed he would do it. I supposed he would do that, and that would have satisfied me if he had dug the outlet. I think that was during the early part of 1884."

If Smith, as drain commissioner, had given plaintiff a proper outlet, there would probably have been no trouble. Certain it is that the drain commissioner could not, under the law, in laying a public drain, empty water that did not belong to Chapel upon him without providing a proper outlet to take it off his premises. If he did so, he would be responsible for the damages. *Cubit v. O'Dett*, 51 Mich. 351 (16 N. W. Rep. 679); *Ashley v. Port Huron*, 35 Id. 296. The case should therefore have gone to the jury upon the question of Chapel's damage,

and whether or not the same was occasioned by water from this tunnel, or from other causes, and whether or not plaintiff had consented to this diversion of the water from its natural flow. If any claim of acquiescence is made by defendants upon another trial, everything done by plaintiff or others in his behalf, by way of protest or remonstrance against such diversion, would be admissible. Proper testimony of this kind was erroneously ruled out in the court below.

The court during the trial made this remark:

"It is a strange doctrine that the court should be kept a week at a time trying an action of trespass on the case for damages when the cause of complaint took place twenty odd years ago; it is a very singular doctrine."

This remark would have been highly improper if the questions of fact had been submitted to the jury. As the court directed a verdict, however, in keeping with this remark, no separate damage was done by it. It was, I think, competent to show that, when Smith put in this tunnel, the surveyor considered it practicable, and that it was practicable, to take the water off this marsh and highway in the direction of its natural outlet, and away from plaintiff's land, and that the railroad officials were willing that the proposed drain should go under or through the embankment of their road.

The judgment of the court below will be affirmed as to defendant Parker, with costs of both courts in his favor, and reversed as to the defendant Smith, with costs of this Court, and a new trial granted as against him.

CHAMPLIN, C. J., and GRANT, J., concurred. LONG, J., did not sit.