RICKELS *v.* LOG-OWNERS' BOOMING CO.

1. ADVERSE POSSESSION—RIPARIAN RIGHTS.

In order to sustain a claim of riparian right by prescription, the claimant must show an exclusive enjoyment of the water, substantially in the way claimed, by claimant or his grantors, adverse to the right of defendant, and without interruption, for a period of at least 15 years.

2. WATERS AND WATERCOURSES — OBSTRUCTIONS — BOOMING COMPANIES—DAMAGES TO CROPS—PLEADING—VARIANCE.

A count against a booming company for damages for injury to crops of a riparian proprietor by flooding, examined in connection with the evidence introduced thereunder, and *held,* that there was a material variance justifying an instruction for defendant as to that count.

3. SAME — LIABILITY OF BOOMING COMPANY — ACTS OF PREDECESSORS.

Where, in an action against a booming company for damages by flooding, plaintiff, by his declaration, limits himself to the positive wrongful acts of defendant, makes no complaint of any acts of omission, and does not allege that defendant was guilty of continuing unlawful obstructions, it is not error to instruct that defendant is not responsible for the acts of its predecessors, but only for its own acts.

4. SAME—CLOSING ARTIFICIAL CHANNEL.

The court may properly instruct, in such a case, that defendant had a right to close any artificial openings, basins, or channels, provided that it did not by such acts crowd the natural channel so that it could not have its ordinary free flow to the lake.

5. SAME—ACTIONS—ISSUES.

Where plaintiff in an action for flooding does not sue as a riparian proprietor, but his complaint is for an obstruction of his drain by positive acts of defendant beginning in 1901, it is immaterial whether the river prior to 1893 flowed naturally in a stream of a certain width.

6. SAME—LIABILITY—INSTRUCTIONS.

In such case the jury are properly instructed that plaintiff is entitled to recover if defendant crowded the natural channel

or changed or obstructed the natural flow of the water so as to impede or hinder the natural drainage of plaintiff's land, and thereby injure his crops.

Error to Muskegon; Russell, J.   Submitted January 6, 1905.   (Docket No. 27.)   Decided February 27, 1905.

Case by Ebel Rickels against the Log-Owners' Booming Company for damages for· flooding plaintiff's land. There was judgment for defendant, and plaintiff brings error.   Affirmed.

The plaintiff is the owner of certain lowlands lying on either side of Four-Mile creek, a small stream that flows into the Muskegon river a short distance above Muskegon Lake.   The creek before it reaches the river expands into a small lake, known as Peck's or· Sanford's Bayou, which empties into the river about a mile from plaintiff's land through an outlet some 20 feet in width. In its natural state the creek was very crooked, and ran along in the center of the valley which it drains between bluffs from 40 to 50 feet high; the width of the lowland between the bluffs being from 20 to 30 rods.

Just at the lower or west line of his land plaintiff built a roadway running entirely across the lowland from highland to highland; the only opening being that left for the creek.   The creek coming from above strikes this roadway at about the middle line of the lowland where it has been diverted from its original course through the center of the valley, and runs along the upper side of the roadway until it reaches the south bank or bluff.   It then runs along the line of the bluff some 60 rods, where it is diverted towards the center of the valley and continues its original course.   Along the west line of the land adjoining Rickels is a similar embankment, and still farther down the stream is another roadway, each about a foot higher than the adjacent land, and extending entirely across the valley with openings for the creek.

The lands of plaintiff along the creek are adapted to the raising of celery, which plaintiff had grown upon the lands for five years prior to 1901 without detriment from water thereon.   The land was quite low and swampy, and, in order to fit it for the cultivation of celery, the creek bed was lowered 2 or 3 feet, and the land was ditched, and the muck taken from the ditches, thrown upon the land, and spread so as to raise the surface of the soil.   The ditches run into the creek, the current of which continued to flow during the entire period covered by the suit.

In 1901 the water in the creek and in the land rose gradually until it was about 4 inches higher than in the preceding year.   The water continued to rise at the rate of 4 inches a year during the ensuing two years, so that in the summer of 1903 it stood from 12 to 15 inches higher than in the summer of 1900.   The result of this rise of the water was to seriously injure plaintiff's crops of celery, and he brings this action to recover his damages for such injuries; alleging that defendant was responsible for the rise of the water, through its conduct of its operations in running logs down the Muskegon river.

Defendant contended, and gave evidence tending to show, that during the years 1902 and 1903 there was an exceptional rainfall, and that the waters in the Muskegon marsh, in Muskegon Lake, and in Lake Michigan were all unusually high.

The Muskegon river has been used for many years for the driving of logs.   The first corporation organized for that purpose was the Muskegon Booming Company, which was incorporated in 1864.   In 1894, on the expiration of the charter of the Muskegon Booming Company, a new corporation was organized under the corporate name of the Muskegon River Booming Company, which operated for about one year.   In 1895 the defendant was incorporated, and leased the property and rights of the Muskegon River Booming Company, and used them in its business; commencing operations in October, 1895.

The Muskegon river, through that portion of Muskegon

county involved in this case, flows through an extensive marsh, and has many outlets and channels, through which the water flows from the river into the marsh, and so into Muskegon Lake. For the purpose of facilitating the floating of logs down the river, the Muskegon Booming Company at an early day made certain improvements, extending some miles up the river. They constructed dikes at various points to straighten and confine the channel, and dredged out and deepened the channel, and made sorting and rafting and coupling basins. About the year 1879 they began the making of a sorting basin, commencing a little above Peck's Bayou, and extending down below the railroad bridge. The river bed opposite the bayou was dredged out and widened to a width of about 150 feet, with the channel next to the south bank, through which the bayou discharged the waters of Four-Mile creek. The company dredged out the entire width of the basin to a depth sufficient to float the logs and enable the men to handle them. Every year the company sent its dredge in, and cleaned the basin and channel out to a depth that would allow the proper sorting and driving of the logs. The use of this sorting basin having become unnecessary through the diminished supply of logs, the company in 1893 ceased to dredge it out and abandoned it. From that time on that part of the river, partly through natural causes and partly through the acts of defendant's predecessors, gradually filled up, leaving the original channel open for the water to pass down on the south side. As the old sorting ground filled up, the action of the river current formed, out of the sand, bark, and other debris that came down, a bed along the north side of the channel. In order to prevent this bed or bank from washing away, the Muskegon Booming Company, and afterwards the defendant, placed brush along the bed or bank, trailing downstream, and forming a dike down to below the railroad bridge, substantially parallel to, and from 30 to 50 feet from, the south bank at Peck's Bayou. At a point a short distance above Peck's Bayou defendant constructed a wing

dam of brush and other materials, extending from near the dike to the north bank of the sorting basin, which prevented the water flowing through a cut excavated by a dredge by its predecessors.   Defendant also put in a brush dam at a point between the railroad bridge and the highway bridge to cut off another dredged channel.   Neither of these brush dams extended out into the south or original channel.   Some time from 1878 to 1882 the Muskegon Booming Company cut a channel through the marsh from the Muskegon river, at a point about a half mile above Peck's Bayou, to a stream known as " Cedar Creek." This was an artificial cut made for the purpose of driving logs through Cedar creek into Muskegon Lake, and when open it carried the greater portion of the river.   This Cedar creek channel was used by the Muskegon Booming Company for several years, but in the later 80's was closed by a dam across its upper end, and remained closed till 1895, when it was again opened.   The defendant used the Cedar creek channel for two or three years.   In the spring of 1899 or 1900 it attempted to close it again, but abandoned its attempts in a few days.   In the fall of 1902 it renewed its attempts, but did not complete the work until the spring of 1903.

*James E. Sullivan,* for appellant.

*William Carpenter* (*Nims, Hoyt, Erwin, Sessions & Vanderwerp,* of counsel), for appellee.

BLAIR, J. (*after stating the facts*).   The plaintiff's declaration contains two counts.   In the first count, after certain preliminary recitals, the pleader alleges that:

" Whereas, also, the waters of said Four-Mile creek flow into a branch of Muskegon river westerly or lower down the river than the land of this plaintiff, and this branch of Muskegon river flows into Muskegon Lake through two channels, known as the north or Blacksmith Shop channel and the south channel; the said north channel

being the main channel, and in its natural state it carries the larger volume of water. The said south channel is an artificial channel, through which the water did not flow unless diverted therein by artificial means. At a point about one hundred rods above the mouth of Four-Mile creek there is a channel or branch leading out of Muskegon river known as the Cedar creek channel, and by far the larger part of the waters of Muskegon river in its natural state flows through said Cedar creek channel into Muskegon Lake. Only a small portion of the waters of Muskegon river flow through the north channel and the south channel, so called, in their natural state; the current of said Cedar creek channel being very strong, and said channel being very deep, in its natural state, and adapted to the running and driving of logs therein.

" For that whereas, also, the said defendant, at the time of the grievance hereinafter mentioned and for a long time previous thereto, has been and is now a corporation engaged in the business of running, driving, and rafting logs in Muskegon Lake, Muskegon river, and its tributary, and it became and was the duty of said defendant to so conduct its business in the natural channels of said Muskegon river and its tributaries so as not to dam, back up, and impede the flow of the water in said Four-Mile creek so as to cause it to stand on the lowland of said plaintiff, and so as to injure his said land, and to cause the same to be sour and worthless, and of little value for the cultivation of celery.

" Yet, notwithstanding its duty in that regard, the said defendant, contriving and wickedly intending to injure said plaintiff, on, to wit, the 1st day of April, 1901, did construct a dam across the north channel, hereinbefore mentioned, by driving a row of spiles across said channel, filling in said channel in front of said spiles with logs, driftwood, brush, and other substances; and also on, to wit, the day and years last aforesaid, the said defendant constructed a dam across the main channel of Muskegon river at a point about the head of said Cedar creek channel, said dam consisting of two rows of driven spiles across said river, and of logs, brush, driftwood, and dirt placed in the bed of said river between and about said rows of spiles, and has continued to maintain and still maintains said two dams just hereinbefore mentioned, by means whereof the said defendant has caused the greater part of the waters of Muskegon river to flow through said artificial channel hereto-

fore mentioned, and through the channel of that branch of said river into which said Four-Mile creek empties, and thereby has caused the waters of said Muskegon river and the waters of said Four-Mile creek unnaturally to set back and overflow, and flood the lowlands of this plaintiff heretofore mentioned, thereby raising the water on said lands of this plaintiff to a height of, to wit, twelve inches. And by its unlawful construction of the two dams aforesaid, and by its unlawful continuance of said dams, said defendant has unlawfully kept said lowlands overflowed and unnaturally submerged by water to a depth of, to wit, twelve inches, thereby rendering said lowlands, and the cultivated part thereof, to be greatly soured, cold, and too low for the growing of celery," etc.

At the close of the testimony the court instructed the jury that there was no evidence in the case to sustain this first count, to which ruling plaintiff duly excepted, and upon which he assigns error in this court. Plaintiff gave no evidence, as to the "North or Blacksmith Shop Channel," alleged in the first count to be "the main channel," that in its natural state it carries the larger volume of water, as he admits in his brief he did not try "to show whether the river runs on the north side or the south side." Neither did the plaintiff produce any evidence to maintain his allegation that "the said south channel is an artificial channel, through which the water did not flow unless diverted therein by artificial means."

The undisputed evidence, however, disclosed that the south channel was the main and natural channel opposite Peck's Bayou, and the swings of the highway and railway bridges were over this channel, through which the water flowed unless diverted by artificial means. There was a like failure on the part of the plaintiff to produce evidence tending to show that "by far the larger part of the waters of Muskegon river, *in its natural state*, flows through said Cedar creek channel into Muskegon Lake." On the contrary, the undisputed evidence showed that the Cedar creek channel was an artificial channel, and that no part of "the waters of the Muskegon river, in its natural state," flowed through this channel.

The allegation that "defendant constructed a dam across the main channel of the Muskegon river at a point about the head of said Cedar creek channel" was likewise not sustained by the proofs. The dam in question was constructed across the Cedar creek channel, and not across the main channel of the Muskegon river.

But plaintiff's counsel contends in his brief that these artificial cuts "by reason of time became endowed with all the rights of law concerning water flowing through natural channels. I think, if the artificial channels were kept open by the other companies so as to drain our land for so long a time as to give us a right by prescription, that the defendant was also bound to keep them open, or at least not to build onto the banks so as to impede the flow of the river."

In order to sustain the plaintiff's claim of rights by prescription, it is essential that the evidence should tend to show an exclusive enjoyment of the water substantially in the way claimed by the plaintiff or by his grantors, adverse to the right of the defendant, and without interruption, for a period of at least 15 years. *Mathewson* v. *Hoffman*, 77 Mich. 420 (6 L. R. A. 349); *Chapel* v. *Smith*, 80 Mich. 100; *Kray* v. *Muggli*, 84 Minn. 90 (54 L. R. A. 473).

The evidence falls far short of showing such an adverse, exclusive, and uninterrupted enjoyment as the law requires. The Cedar creek channel was cut through the marsh in 1882. A dam was constructed across its head in the later 80's, and was maintained there until 1895—the year when plaintiff purchased his lands on Four-Mile creek. So far as any prescriptive rights in the maintaining of an open channel through the Cedar creek cut were concerned, they were simply inchoate when the dam was constructed, in the later 80's, and the interruption of their growth prevented their ripening into vested rights. We think there was a material variance between the declaration and the proofs, and that the court was justified in instructing the jury that the plaintiff was not entitled to recover on his first count.

*Wood* v. *Rice,* 24 Mich. 423; *Batterson* v. *Railway Co.,* 49 Mich. 184; *Macumber* v. *Booming Co.,* 52 Mich. 195; *Ives* v. *Williams,* 53 Mich. 636; *Bolton* v. *Railroad Co.,* 95 Mich. 202.

In the second count of his declaration the plaintiff alleges that, as the owner of the lands on Four-Mile creek, he was—

" Entitled to have the waters from time to time collected and being in and upon the said lands drained and carried away from the same through a certain drain or creek therein called Four-Mile creek, and from thence through Muskegon river and Muskegon Lake into Lake Michigan.    Yet the said defendant on, to wit, the 1st day of April, 1901, wrongfully placed large quantities of spiles, earth, rubbish, and other matter so as to obstruct said drain, and wrongfully stopped up and obstructed the said drain, and continued the same so stopped up and obstructed, whereby large quantities of water which from time to time during that time collected, were in and upon the said land of the plaintiff, were obstructed and prevented from running away from the same through the said drain or creek and rivers as they otherwise would have done, and were penned and driven back upon the said land of the plaintiff, and accumulated thereon, and by reason thereof the said land of the plaintiff is rendered wet and swampy and unproductive," etc.

The court submitted the case to the jury on this count, charging them in the language of plaintiff's first request to charge, as follows:

" The plaintiff in this cause had the right to have his land mentioned in the declaration drained through Four-Mile creek, so called, Sanford's Bayou, so called, and Muskegon river, as it was wont to run into Muskegon Lake, and the defendant had no right to change or obstruct the natural flow of the water of Muskegon river past Sanford's Bayou, or past the place where it entered into Muskegon river, and so as to impede or hinder the natural drainage of the plaintiff's land; and if you find that the defendant by any artificial means in Muskegon river raised the water so as to injure the crops of celery on the land of plaintiff during the seasons of 1901, 1902, 1903, or any of them, then the plaintiff is entitled to recover."

The court, however, limited or qualified this instruction, and, plaintiff's counsel contends, practically abrogated it, by subsequent instructions to the effect that the defendant was not responsible for any of the improvements made or obstructions placed in the river by others, but only for its own acts since 1896; that it had a right to close up any artificial openings from the Muskegon river, and any artificial channels or basins made in that river, provided that it did not crowd the natural channel of the river so that it could not have its ordinary free flow down to the lake; and that all the plaintiff was entitled to was a fair flow of the river in its natural bed.

Plaintiff's position, as stated in his brief, is as follows:

"Under the second count of our declaration, we claim we had the right to prove that Four-Mile creek and Muskegon river was a natural drain to our land, and that the defendant obstructed the drain. Now, it is plain from the proofs that from time out of mind up to the year 1893 that the water from Four-Mile creek flowed uninterruptedly into the Muskegon Lake through the Muskegon river channel at least 150 feet wide at the bridge, and that up to the year 1901 the water never had raised on plaintiff's lands so as to do any damage. Now, the whole Muskegon river was part of the drain, including with it Cedar creek channel; and when this channel was closed off so as to prevent the water flowing out through it, and as the channel in the main river was so narrowed that the water could only pass below Peck's Bayou in a stream of about 30 feet wide, where it was to run in 150 feet, there were such artificial obstructions in the drain that we claim they did flood our lands, and we had the right to have the jury consider these artificial obstructions that had been placed there, including the obstructions placed in the Cedar creek channel. * * * That is, the whole artificial impediment placed there prevented the water from flowing out through the Cedar creek channel as it was wont to flow, and through the main river as it was wont to run, made a dam surrounding Four-Mile creek."

It is not apparent how the acts of defendant's predecessors could have injured plaintiff, since they were all committed prior to October, 1895, and counsel concedes "that

up to the year 1901 the water never had raised on plaintiff's lands so as to do any damage." Again, plaintiff's counsel alleges in his brief: "We showed by the celery planters on the creek that there had never been any trouble of water standing on the land till the year 1901." Moreover, the plaintiff, by his allegations in the count of the declaration now under consideration, has limited himself to the positive wrongful acts of the defendant. He makes no complaint of any acts of omission on the part of defendant, but solely of acts of commission, and attributes his injuries to such acts. He does not allege that defendant was guilty of continuing unlawful obstructions or damming up artificial channels, but charges it with wrongfully placing large quantities of earth, spiles, rubbish, and other matter so as to obstruct his drain, consisting of Four-Mile creek and Muskegon river. We think the court committed no error in charging the jury that under such a count the defendant was not responsible for the acts of its predecessors, but only for its own acts.

Neither was the court in error in charging the jury that defendant had a right to close up any artificial openings, basins, or channels, provided that it did not by such acts crowd the natural channel so that it could not have its ordinary free flow down to the lake.

We think the court was correct in saying to the jury that all the plaintiff was entitled to was "a fair flow of the river in its natural bed." The declaration made the Muskegon river a part of the drain, and this must be held to mean the river in its natural state at the time of the acts complained of. The essence of the complaint is that plaintiff had a drain which properly drained his lands prior to the unlawful interference of defendant, but, owing to the obstructions placed in the drain by defendant in 1901 and afterwards, the drain thereafter ceased to properly drain his lands. The plaintiff does not sue as a riparian proprietor of lands on the Muskegon river, and is not entitled to recover in this case upon the theory of injuries to his rights as such proprietor. His complaint is for an ob-

struction of his drain by positive acts of the defendant, beginning in 1901, and this necessarily implies an obstruction of the drain as it existed at the time the acts were committed. We think, therefore, that whether the river "from time out of mind, up to the year 1893," flowed by Peck's Bayou in a stream 150 feet wide, was wholly immaterial under this second count. We do not find in the evidence, fairly considered, however, any substantial support for plaintiff's claim that it did so flow, and we think the jury would not have been warranted in finding from the testimony in the case that the river from "time out of mind" had flowed naturally at a width of 150 feet past Peck's Bayou. On the contrary, it was practically undisputed that, when left to itself and affected only by natural causes, the river flowed in the south channel, where it was flowing at the time of the injuries complained of, at a width of somewhere from 30 to 60 feet. But however this may be, the question was fairly submitted to the jury as to whether the defendant by its acts crowded the natural channel of the river so that it could not have its ordinary free flow down to the lake; and the jury were expressly instructed that if the defendant did crowd the natural channel, or changed or obstructed the natural flow of the water of Muskegon river past Sanford's Bayou, so as to impede or hinder the natural drainage of the plaintiff's land, and thereby injured his crops of celery, the plaintiff was entitled to recover. This, we think, under any possible view of the testimony, was all that plaintiff was entitled to.

The judgment is affirmed, with costs.

MOORE, C. J., and MCALVAY, GRANT, and HOOKER, JJ., concurred.