## William H. Craig and another v. Charles Bradley and others.

*Assignment: Subsequent agreement.* An assignment which contemplates simply the selling of the assigned property forthwith by the assignees, and the application of the proceeds to the payment of debts of the assignors for which the assignees were liable as endorsers, and the return of the surplus, if any, is subverted and superseded by subsequent arrangements which embrace a continuation of the business of the assignors by the use of the assigned property,

26 MICH.—45.

together with advances to be made by the assignees, with the aid of both parties to the assignment, as well as a third person; such new arrangements cannot be treated as mere aids to the execution of the original assignment; they are not merely subsidiary, but fundamental and repugnant.

*Bill in equity: Proofs.* Where a bill in equity, in its statement of oral agreements which are essential to the relief sought, is indefinite and ambiguous, and the proofs are loose and incongruous, and fail to sustain, by a preponderance of evidence, the substance of the case stated, no relief can be granted.

*Fraud: Diligence: Waiver.* Parties who have been defrauded must use diligence to obtain redress within some reasonable time after discovering it; and are barred by such subsequent dealings as indicate a waiver of their right to complain.

*Fraud: Compromises: Waiver.* Where, after discovering that they had been defrauded, complainants made two distinct compromises with defendants, and received from them securities for the amount agreed on,—although compelled to consent by a strong pressure of pecuniary difficulty,—they thereby waived their right to complain of the original fraud. Fraud may be waived and condoned, and a defrauded party must act consistently in refusing acquiescence, in order to keep his claim in force.

*Heard October 25 and 26.   Decided January 14.*

Appeal in Chancery from Wayne Circuit.

*J. P. Whittemore, H. L. Baker* and *William P. Wells,* for complainants.

*Ashley Pond* and *J. H. Knowlton,* for defendants.

GRAVES, J.

The first task in examining this cause, is to ascertain as far as may be, the groundwork of the case as indicated by the bill, and get at the substance of the matter on which the complainants rest their claim for relief in a court of equity.

It is just as necessary for his success in chancery, that a complaining party should first state a definite and comprehensible case, and then prove it substantially as laid, as it is at law; and whenever doubts and uncertainties spring from indefinite or ambiguous statements in the bill, or from loose or incongruous proofs, they must generally be resolved adversely to the party to whose faulty or infirm proceedings they are owing; and if he has a meritorious

cause of action, but is unable to prove it by a sufficient weight of evidence, the result is his misfortune, for which no relief is possible in civil tribunals. It is not easy in this instance to determine what exact view was taken by the pleader. In some of its parts the scheme of the bill is dubious and unprecise. Much, however, if not all of this, was probably owing to the refractory nature of the materials, and their vague and desultory character.

It may be confessed that a careful study of the record leads to the belief that complainants have been hardly and unfairly dealt by, but this will not avail to warrant the court in decreeing, unless it appears that a determinate case for equitable cognizance is set up, and that the same case is substantially established by a preponderance of evidence.

Without recapitulating the bill, an attempt must be made to gather from it the essential and ultimate ground upon which the complainants now seek judicial intervention. But before doing this, a proper understanding of the matter, necessitates a general reference to certain preliminary business events which the bill details.

Prior to the 19th of September, 1857, the defendants, Lott Frost and Charles Bradley, composed the firm of Frost & Bradley, and this firm held the legal title to two large steam saw mills, one at what is now called Bay City, and the other at St. Charles, on the Saginaw river. The firm also held the legal title to extensive tracts of pine lands not far distant, and owned three lake vessels, a large quantity of pine logs and lumber, a quantity of merchandise for traffic in connection with lumbering operations, and teams and implements for lumbering and manufacturing lumber. At the same time they held a short lease of a lumber yard at Chicago, and held some other personal property. For some time before and up to the time just

mentioned, they had been, and were, extensively engaged in manufacturing and selling lumber, and much of the business had been, and was being, conducted by the aid of defendants, Nathan B., Henry M., and Frederick E. Bradley, brothers of Charles; they being engaged respectively at distinct points, and being peculiarly conversant and familiar with the business and its requirements thereat.

All the real estate so held by the firm, as well as the vessels, was heavily incumbered, and the firm was otherwise deeply indebted, and, as the bill claims, insolvent. Two of the vessels were subject to large mortgages given to C. & A. Ives of Detroit. The complainants were direct creditors of the firm to a limited amount, and were likewise liable on their account as sureties, in different forms, in the sum of between twenty and thirty thousand dollars, as the bill states, for which there was no security, and in the further sum, as the bill also states, of about eleven thousand dollars in favor of C. & A. Ives, who held liens on the vessels as primary security.

Under these circumstances, which are related more at large in the bill, the firm, on the 19th of September, 1857, made, in writing, the following assignment to complainants:

"Whereas, the firm of Craig & Bro. are liable, by way of endorsement and otherwise, for the undersigned, Frost & Bradley, for over the sum of ten thousand dollars, and said Frost & Bradley are desirous of paying and securing said Craig & Brother; now, therefore, in consideration of said liability, we, the said Frost & Bradley, have, and hereby do sell, assign, transfer and set over to said Craig & Bro., all the following described property, situated at Lower Saginaw or Bay City, viz.: all the lumber we have at said place, supposed to be from three hundred thousand to four hundred thousand feet, being partly in raft and partly on the dock; all the logs we have at said place, sup-

posed to be about a million feet; all the shingles, supposed to be from two hundred thousand to three hundred thousand; all the lath, supposed to be about the same amount; the entire stock of goods in our store at that place, supposed to be fifteen hundred dollars in value; two yoke of oxen; one two-horse wagon; one one-horse wagon; one horse, and one sail boat.

"Also, all the property hereinafter described situated at St. Charles, or on the way from St. Charles to said Lower Saginaw, to wit: all our lumber, supposed to be from two hundred thousand to three hundred thousand feet; all our lath, supposed to be one hundred and fifty thousand; all our shingles, supposed to be over one hundred and fifty thousand; all our logs, supposed to be from one million to two million feet; the entire stock of goods in store at St. Charles; two yoke of oxen; three horses; one lumber wagon; five tons of hay; one field of corn; one field of potatoes, and oats in the same field.

"Said Craig & Bro. are authorized and clothed with full power to take possession of said property and to *sell the same forthwith, and convert the same into money, and apply the proceeds to pay the debts for which they are liable as aforesaid, and to pay over the surplus to the undersigned.*

"An inventory of said property is to be forthwith taken. Witness our hand, September 19, 1857, at Detroit.

(Signed)        "FROST & BRADLEY."

To this assignment, a schedule, or inventory, of the property, and its assumed value, was attached, which showed a total valuation of twenty-four thousand one hundred and eighty-nine dollars and fifty cents.

The bill states, that although the property at the time was estimated at about twenty-four thousand dollars, it was not, in its then condition, convertible into cash at that sum, and yet, that it comprehended all the effects of the

firm, which were then available to pay the demands for which complainants were liable, except the use of the mills and vessels during such time as the owners of liens upon them should not foreclose, and except also the unexpired lease of the Chicago yard and the fixtures; and that the mills, yard and lease could be only turned to account, in paying up the indebtedness for which complainants were liable, by being used in connection with the vessels and assigned property. It is then stated that shortly after the assignment it was agreed between complainants of the one part, and Charles Bradley, who represented Frost & Bradley, of the other part, that the *business* theretofore conducted by Frost & Bradley, should be continued under complainants, in all respects, the same as it had been carried on before the assignment; that complainants, in *addition* to the assigned property, should furnish what they could afford of their own means, and that Frost & Bradley should put in what they could "*rescue from the wreck*" of the firm property, in order to carry on the old business until the assigned property could be *converted* to the payment of the debts to be paid under the assignment, *and also the advances of money and property by complainants could be fully paid*; that Charles Bradley should go on and manage the business and have the principal charge under complainants, but should *receive no compensation therefor*; that the brothers of Charles, who had been, and were, acting for Frost & Bradley, should continue in charge, under the general direction of Charles, until the business should be closed by "realization" and conversion of the property into money, and the payment of the debts under the assignment, and the *advances of complainants;* that said brothers of Charles, on their part respectively, agreed to enter the service of complainants, under the *assignment and agreement,* and to continue therein *until the close of the busi-*

*ness,* as they had done for Frost & Bradley; that complainants took possession of the *assigned property,* and *charge of the business under the assignment and subsequent agreement,* and made large advances in addition to the assigned property, in order to carry on the *business;* and, among other things, that they furnished in the fall of 1857, and after the assigned logs had been sawed, over one million one hundred thousand feet of pine logs, and that the defendants Bradley, for several years, conducted the business under the general charge of the defendant Charles; that the vessels before mentioned, were used in the business, and that it was part of the plan that their use, and what could be saved of their value, should be applied in "said trust business."

The bill then charges that the defendants Bradley, and especially Charles, committed numerous violations of duty, involving breaches of trust, and among them the fraudulent appropriation, for the private benefit and emolument of the Bradley brothers, of property belonging to the business under the *assignment and succeeding agreement,* and resulting in failure and refusal to apply the property or its proceeds, to the satisfaction of the first demands and subsequent advances of complainants. The bill likewise charges that the defendants have refused to account for the property connected with the said business.

This outline will sufficiently indicate the character of the case, as represented by the bill, and lead to an understanding of the point upon which I think our decision may rest.

It will be observed that the existing controversy is between the immediate parties to the alleged arrangements, and is not made to concern independent creditors.

According to the bill, the injury complained of was caused by infringements of direct contract duties and

arrangements, and is not one which proceeded merely from collateral or remote transactions, and a close scrutiny of the record indicates that, by the theory of the bill, the basis of complainants' equities is to be found in the final position and relations of the parties as between themselves, as a consequence of all the arrangements and stipulations set forth, and not their position and relations as a consequence of any particular part or portion of such arrangements and stipulations.

It is, therefore, necessary, if possible, to gather from the statements of the various arrangements, the nature of these final relations.

We find that, by the writing of the 19th of September, 1857, the firm of Frost & Bradley transferred to complainants, the logs, lumber, merchandise, teams, and other personal property, at Lower Saginaw and St. Charles, and on the way to Lower Saginaw, but upon trust, to *sell* and apply the proceeds as directed by the instrument. The effect of this as between the parties, was to convey the legal title of this property to complainants, and to require them within a reasonable time to *sell* it, apply the proceeds on the firm debts for which complainants were liable, and pay the balance, if any, to Frost & Bradley. The title to all this property and the power to dispose of it, were, as to these parties, effectually separated from the ownership and power of disposition of the mills, vessels, and other unassigned property. Upon acceptance of the assignment, and in the absence of any intervention by other parties, it was in the power of Frost & Bradley to compel the complainants to execute the trust according to its import.

The succeeding verbal arrangements, as set forth, however, completely changed all this. Assuming them to have been made as stated, Frost & Bradley, after they were entered into, could not compel the execution of the trusts mani-

fested by the written assignment. They were subverted. The new arrangements handed over the property to the management of Charles Bradley, not to be sold as provided for by the assignment and to have the proceeds applied according thereto, but to be used in carrying on the lumber business as it had been transacted all along by Frost & Bradley. The complainants were to make advances to aid that business, and the mills, Chicago yard, and vessels, and other unassigned property, were likewise to be used in the business. Besides, Charles Bradley was not only to contribute his skill and services, but as a part of the plan, his brothers were to remain and act, and the claims on the fund, aside from expenses and other considerations, were to extend to new advances to be made by complainants.

These new arrangements were not contrived as mere aids for the execution of the primary scheme. They were not merely subsidiary, but fundamental and repugnant. The products were to be, not the proceeds of the assigned property, but the blended results of all the proposed elements and agencies, and the returns worked out of the combined elements and operations, were not to be applied solely to pay the demands for which the complainants were liable on the 19th of September, 1857, and leaving the balance, if any, to be paid to Frost & Bradley, but they were to be used in satisfying those demands, and *also to repay to complainants all new advances.*

As already stated, it then appears upon the statements of the bill, that the parties by their voluntary action, subsequent to the written assignment, adopted a new and inconsistent scheme, and thereby superseded and subverted whatever trust was created by that assignment. Whatever claim for relief the complainants have, then, upon any supposable theory of the bill, must depend upon whether the alleged new arrangements and relations were entered into as

26 MICH.—46.

charged.    And without attempting to find a definition for the condition produced by these anomalous complications, which are denied by the principal and only defendant who has answered or been subjected to that necessity, it is next to be seen how the evidence serves to substantiate them.

The complainants having compelled the defendant, Charles Bradley, to make answer on oath, his response is naturally the first thing to be looked at. In his first answer he denies that any such agreement as that alleged, was ever made.    But he there admits that an agreement was made relative to the property assigned, and that he was thereby to convert the assigned logs into lumber by the use of the mills, and to sell such lumber with the other assigned property.    He denies that other logs were to be obtained to continue the business, or that the mills were to be used for the benefit of complainants, beyond their use in sawing the assigned logs.    He also denies that complainants were to furnish moneys to go on with the business, further than should be necessary to enable him to run the mills while cutting such logs, and to enable him to sell the lumber and other assigned property.

He further denies that he was to go on and manage the business for complainants free of charge, or that his brothers were to continue in charge, under his direction, until the business should be closed, or that his brothers agreed to do so.    He also denies that complainants took charge of the business carried on at the mills, or that the earnings of the vessels, or what could be saved of their value, was to be applied under the trust created by the assignment.

Subsequently, and in answer to the fifth and sixth special interrogatories, he insists upon the correctness of the version given in this answer.

In his further answer of July, 1870, he says that the

understanding and agreement with complainants, subsequent to the assignment, was, that he should take charge of the assigned property, convert the same into money and use it to pay the debts of Frost & Bradley mentioned in the assignment, and that to that end, he should, by the use of the mills, cause the assigned logs to be manufactured into lumber, and cause the lumber assigned, and that so manufactured, to be transported to Chicago, and there sold under his charge and direction; that his brothers should or might aid in so carrying on that business, upon the same salaries they had theretofore received from Frost & Bradley, and that this was in substance the whole agreement and understanding. He also says that the logs subsequently furnished by complainants, were to be sawed into lumber, and the proceeds used in payment of his debts, and that it was afterwards agreed that he should pay complainants for that lot, three dollars per thousand, and he then states that no arrangement, agreement or understanding was entered into between himself and complainants, concerning the employment of his brothers in conducting the business under the assignment, except that he told complainants, when the arrangement was made, that they would undoubtedly continue upon a salary, as they had been doing, and within about a week afterwards, told his brothers to continue.

On his direct examination as a witness, the complainant, William H. Craig, speaking in reference to this subject, says: "That defendant Bradley did not, in some respects, fully state the agreements entered into, while in others, he misstated them, or so stated them as not to give a clear understanding of the arrangements."

He then proceeds to give his own version, as follows: "Soon after the assignment, Mr. Bradley was very desirous that we should let the lumber assigned, go forward to Chicago to be sold. He proposed that if we would do so, that

a large saving could be made out of the property, over and above our liabilities and the amount due us, and as an inducement for us to do so, he would put in the use of the mills at St. Charles, and Bay City, the three vessels 'Craig,' 'Ross,' and 'Mont Eagle,' and himself and three brothers would give their best energies to the business, and they would only draw out, or only ask for what was necessary for their living, by which means he assured me he could save ten thousand dollars out of the property assigned, over paying all liabilities of ours, and for which the property was assigned.

"It was understood between us, that some advances from us would be necessary to carry on the business, in addition to the property assigned; and when I was at St. Charles and Lower Saginaw, soon after the assignment, I looked the property over at those points, as well as the logs, lumber, and shingles, in transit from St. Charles to Lower Saginaw, and concluded there was about the amount stated in the assignment, both of logs, lumber, and shingles, merchandise, etc. While at St. Charles, I had conversation with Nathan B. Bradley, who was in charge there, and with Charles Bradley. We stated to him the condition of things, and the course proposed to be pursued, viz.: the manufacturing the logs into lumber and shingles, and the transporting the same to Bay City, on the terms above set forth, to which Nathan B. Bradley assented fully.

"I then gave directions to N. B., to proceed to manufacture the logs into lumber, and to transport the same to Bay City, as he had done for Frost & Bradley. I stated to the laborers at the mills, that I would be responsible for their wages. N. B. then gave me an order for some supplies,—pork, flour, butter, or other supplies, which I forwarded as requested by him, and we continued to furnish supplies as wanted by him thereafter.

"Leaving St. Charles, we proceeded down the river in a canoe to Bay City, examined the property on the way and at Bay City; had a full conversation with Henry M. Bradley, who was in charge there, as to Charles' proposition, and what I wished him to do. I instructed him to have the logs there, and such as were received from St. Charles, manufactured into lumber and piled on the dock, as well as all lumber received from St. Charles, and to have all well cared for. I then gave assurance to the laborers that I would see them paid for their labor. I also took H. M. Bradley's order for such supplies as he wanted, and sent them to him, and continued to send him supplies from time to time thereafter, H. M. assenting to the proposition made by Charles, which was fully talked of; Charles, at this time, not being recognized as giving any direction in the premises. Neither did I, at this time, intend to send the lumber to Chicago, unless it was assented to by the Detroit creditors.

"On my return to Detroit, I conferred with many of the creditors, to whom I made a full statement as to how I found things at Saginaw, and that I thought there was property enough to pay all claims; and I stated, also, Charles' proposition to use the mills, vessels, himself and brothers, to manufacture the lumber, transport the same to Chicago, and sell it there. The creditors decided to leave the matter wholly to me, and I, being of the opinion that there could be a saving made, as Charles had stated, over the liabilities, and feeling anxious to make such saving, consented to Charles' proposition to let the lumber go forward to Chicago, to which end the mills and vessels were to be used as before stated.

"Charles wished me to take the title to the vessels in my name, but in consideration of the amount of the incumbrances, I declined, believing I should be exposed to damages

for collisions or other damages, against which the value of the vessels would be no protection, but suggested to him to place the title in the name of one of his brothers, if it was necessary to change the title. When we assented to this arrangement, it was understood substantially that we stepped into the shoes of Frost & Bradley in carrying on the business of manufacturing, transporting and selling the lumber, using and having the benefit of all property then in the control of Bradley, or Frost & Bradley, including the services of Charles and his three brothers. It was on the promises, representations and pleadings of Charles Bradley, that I consented to continue 'the business.'"

After detailing an arrangement to employ certain other vessels in the concern, Mr. Craig further states, that it was afterwards agreed with Charles Bradley that complainants should put in the one million one hundred thousand feet of logs mentioned in the bill, and that they should be manufactured and disposed of in the same way as the assigned logs, but that complainants should be paid a fair consideration therefor, which Mr. Craig swears was from four dollars and fifty cents to five dollars per thousand.

On his cross-examination, he says that the first agreement after the assignment, was made at Saginaw or St. Charles about ten days after the assignment, and was verbal, and that he does not recollect that any one besides himself and Charles Bradley was present. He says further that the terms were finally agreed upon at Detroit, and within two weeks after the visit to Saginaw; that the terms were, that Charles was to put in his vessels, mills, and whatever he had, his own time, and that of his brothers, and that complainants, on their part, were to furnish such supplies as should be needed; that such were the main features of the arrangement, and all of it which he recollects; that the "business" was to be carried on in the name of

CRAIG v. BRADLEY.

"Craig & Bro.;" that Charles and his brothers were to proceed about as they had done under the old firm,—manufacture the lumber, and get it to Bay City; that Charles was to receive no more than he needed for his living, and expenses, "perhaps," and that the brothers were to receive no more than was necessary for their living, and were to continue until the lumber was manufactured and disposed of, and the liabilities paid; that the first agreement did not embrace the vessels, or contemplate taking the lumber to Chicago; that the second agreement was made at Detroit, and about two weeks after the first, and that he does not recollect who was present when it was made; that, by the terms of this agreement, Charles was to furnish the mills, the vessels, the use of his time, and that of his three brothers, and such effects as he had, and that complainants were to furnish such supplies and help as should be necessary, aside from the assigned property, to enable them to carry forward the business; that complainants, also, were to see the laborers in the mills and about the work paid, and that this arrangement should continue until the lumber should be manufactured and disposed of and the liabilities all paid, and beyond the mere disposition of the assigned property.

This testimony of Mr. Craig constitutes complainants' evidence of the nature of the verbal arrangement set up in the bill, as succeeding the written assignment, and the case it makes on that subject is, in my judgment, materially different, upon any reasonable construction, from that the bill is understood as setting up. But it is quite unnecessary to pause for the purpose of indicating the supposed discrepancies, because it is believed that complainants have failed to prove, by sufficient evidence, any other arrangement subsequent to the written assignment, than such as

the defendant, Charles Bradley, has admitted; and this admitted arrangement is so completely at variance with the case made by the bill, and comes so far short of it as to exclude all possibility of identity.

The testimony of Mr. Craig on the subject in question, is not only opposed to the answers, upon oath, of Charles Bradley, which the bill called for, but is contradicted by the evidence given by Charles Bradley, as a witness. He explicitly denied, when upon the stand, the making of any arrangement of the nature set forth in the bill, and the testimony of Nathan B., Frederick E., and Henry M. Bradley, so far as it bears on this branch of the case, rather favors the position of Charles, than that of complainants.

As these arrangements, which the complainants charge to have been made, were all verbal, and quite loose and indefinite, when most favorably considered, it is very possible that the minds of the parties never in fact met upon any precise terms.

But be this as it may, it appears to me certain, that complainants have failed to show, by a preponderance of evidence, the substance of the case they have stated as that entitling them to relief.

I think we may well feel less inclined to hesitate in deciding on this ground, because there are other difficulties in the way that are quite serious, and in the opinion of some of the judges, insuperable; and they grow out of the following combined circumstances, among others: The somewhat indeterminate and confused state of affairs and relations, depending on loose conversations, in occasional interviews and accidental meetings; the exhaustion of the assigned property, and the way and time in which it occurred; the subsequent adjustments and compromises; the admitted knowledge of complainants at the time, of ante-

cedent and contemporary facts and situations now called in question; and the considerable delay of complainants in bringing suit.—*Crissman v. Crissman, 23 Mich., 217.*

The decree of the circuit court in chancery, dismissing the bill, must be affirmed, with costs of this court.

CHRISTIANCY, CH. J., and COOLEY, J., concurred.

CAMPBELL, J.

I think the evidence in this case makes out very strong general equities, and that, except for subsequent transactions, there would be a valid claim for an accounting. The testimony is very strong in regard to the original claims of the complainants, and the unfair conduct of the principal defendant, and bears heavily on all the defendants, though more inferentially.

But it appears by the bill that complainants became satisfied of the fraud of the defendants, as early as 1860, when it charges them with throwing off the mask, and setting complainants at defiance, and refusing to account, or to recognize any further liability.

The principles of equity require some diligence in the prosecution of frauds, and they absolutely forbid any such dealings,—after such discovery,—as indicate a design to waive the right to complain.

In this case there were at least two compromises, made deliberately, and with a full knowledge of the misconduct of defendants, whereby complainants obtained securities and paper, on which they realized considerable amounts; and by the last compromise, whereby they received endorsed paper, they agreed to transfer a considerable amount of the claims they held against Frost & Bradley, to Nathan B. Bradley, who was the endorser, thereby surrendering, if not

26 MICH.—47.

assigning, the principal demands on which this bill is founded.

Although it is evident these arrangements were consented to under a strong pressure of pecuniary necessity, they do not differ in this regard from any other hard compromises; and having elected to make them, and accept their fruits, complainants cannot afterwards prosecute their claims arising out of the original breaches of trust. Fraud may be waived and condoned; and a' defrauded party must act consistently, or he will lose his right to complain of it.

I am reluctantly compelled to the conclusion that complainants have surrendered their equities arising out of the frauds complained of.

CHRISTIANCY, CH. J., and COOLEY, J., concurred.