. PLUCHAK *v.* CRAWFORD.[1]

EQUITY—ANSWER—AMENDMENT TO CONFORM TO PROOF.

> Pleadings and evidence in a suit for injunction examined and *held* proper to reject an amended answer offered after the proofs were closed setting up a prescriptive right inconsistent with the original answer.

Appeal from Menominee; Stone, J.   Submitted June 16, 1904.   (Docket No. 29.)   Decided September 13, 1904.

Bill by Robert Pluchak against Samuel Crawford and others to restrain the flooding of complainant's land. From a decree for complainant, defendants appeal. Affirmed.

[1] Rehearing denied May 12, 1905.

*N. C. Spencer*, for complainant.

*L. D. Eastman* (*E. C. Eastman*, of counsel), for defendants.

MOORE, C. J. The complainant is the owner of a steam sawmill on Devil's creek. The defendants are owners of 40,000,000 feet of timber, which for three years they have been cutting and floating down said stream, using two dams for that purpose. They expect, according to their claim, to continue to cut and float down the stream logs cut from this timber at the rate of 2,000,000 feet a year. It is the claim of complainant that by the use of these dams his property is flooded so that 2½ feet of water stands upon the engine room floor of his mill, that the flooding continues so long the standing water kills his timber, and that he is deprived of the use of his mill for a considerable portion of the season. The complainant filed an injunction bill. The learned trial judge, in granting a decree for complainant, filed a written opinion, which represents clearly nearly all of the questions involved. The material parts of it read as follows:

"This cause was heard upon the pleadings and proofs taken before the circuit court commissioner, except that at the hearing the testimony of Frank Donnelly, Thomas Duncan, Frank Gerue, and John Murphy was taken in open court by consent of the solicitors for the respective parties.

"I have spent a good deal of time in the examination of the pleadings and evidence in the case. I shall only refer to such parts of the pleadings as are necessary to explain my conclusions. Neither do I deem it necessary to refer to the evidence at length. The parties were first before me soon after the bill was filed upon the motion of complainant for an injunction. The pleadings were then examined, and also numerous affidavits in support of the bill and answer. I made an order at that time that an injunction issue as prayed for unless the defendants should execute and deliver to complainant a bond in the sum of $1,000, with sureties to be approved by the register of the court, conditioned that said defendants would pay and perform any decree that might be entered in the case.

The bond was given, and hence no injunction has ever been issued. Soon after, and on March 21, 1902, by virtue of a stipulation on file, complainant amended his bill of complaint so as to include a claim for damages and an accounting for the alleged flooding of complainant's said premises for the years 1900 and 1901, and the case has proceeded upon the claim for damages and an accounting for the three years of 1900, 1901, and 1902. The bill was filed primarily to restrain the defendants in the operation of certain dams in Devil's creek, in Menominee county, to compel the abatement thereof, and to recover damages from defendants for the flooding of the complainant's premises, as set forth in the bill. At the final hearing defendants' solicitors asked leave to file an amended answer. This motion was made after the proofs had been closed. I will consider and dispose of the questions raised by counsel in the order in which they are presented in their briefs.

"1. The solicitors for the defendants raise the question and express doubt as to the jurisdiction of this court. In view of the Michigan decision cited by complainant's solicitor in his brief, and especially in view of the two cases somewhat recently decided by this court and affirmed in the Supreme Court, there can, I think, be no serious doubt of the jurisdiction of the court. I refer to the cases of *Michigan Land & Iron Co.* v. *Lumber Co.*, 109 Mich. 164 (66 N. W. 953), and *Hall* v. *Nester*, 122 Mich. 141 (80 N. W. 982). The principle that equity, having once acquired jurisdiction, will retain it, to give such full relief as will finally dispose of the controversy, is well settled in this State.

"2. As to defendants' right to file an amended answer raising for the first time a prescriptive right in defendants to flow the complainant's land, I am of opinion that it would be inequitable to allow the amendment to be made at this stage of the case. In defendants' answer, which was sworn to, it is stated:

"'That these defendants, nor any nor either of them, have never attempted to assume or exercise exclusive possession or control of the said Devil's creek, or to exclude or prevent the complainant or any other person from banking, floating, and driving his or their saw logs in said creek in, through, and over the said dams of these defendants, and do not desire or intend to interfere with or exclude the complainant in any manner from the free enjoyment of said

Devil's creek for the purpose of floating and driving his saw logs down the same.' ·

"Upon the issue framed upon this answer the complainant, and in fact both parties, proceeded to take a large amount of testimony before the commissioner, continuing for many months, and involving a good deal of expense to complainant. The proposed amended bill (answer) is wholly inconsistent with the position taken by the defendants in their original answer. As complainant's solicitor well says:

"'One of the all-important elements of a prescriptive right or title is the adverse holding. A holding, to be adverse, must be distinct and hostile. The defendants now undertake to claim an easement in the complainant's land. The owner of an easement in the land of another has a right therein which is paramount to the rights of the owner of the fee. It is a right which brooks no interference from any one. It is a right which necessarily interferes with the convenience of the owner of the servient estate whenever his convenience conflicts with that of the owner of the dominant estate. In order to gain an easement by prescription, this hostility must have been maintained for the statutory period.'

"This is so inconsistent with and repugnant to the position taken by defendants in their sworn answer filed in the case, and upon which the issue was framed and the testimony taken, that to permit the proposed answer to be filed would be an injustice to the complainant. It would be such an entire change of position on the part of the defendants that it would be an abuse of discretion to permit the amendment. The case of *Ogden* v. *Moore*, 95 Mich. 290 (54 N. W. 899), although relating to amendments of a bill of complaint, applies as well to the answer as to the bill. But it is urged that the amendment should be allowed so that the pleadings may conform to the proof. I have carefully examined the testimony, and have been unable to find any evidence that would support the proposed answer in this respect. Even the testimony of John Murphy, especially when viewed in connection with his affidavit on file in the case, fails to show any such actual, continued, visible, notorious, distinct, and hostile possession as would satisfy the rule relating to the establishment of a prescriptive right. If his testimony tends to establish any possession at all, it was a possession without any claim of right, and in no way hostile. The evidence is undisputed that the Spalding Lumber Company

put its drives through in such a short time that it did not materially injure the complainant. The evidence all tends to show that the damage complained of all occurred in the years 1900, 1901, and 1902. A prescriptive right can only be exercised in the manner and to the extent that it has been used during the whole prescriptive period. *Chapel* v. *Smith*, 80 Mich. 100 (45 N. W. 69); *Osten* v. *Jerome*, 93 Mich. 196 (53 N. W. 7). It is a well-established rule in this State that a pleading defective in its averments will not be amended where the case is essentially defective on the proof. *Curtis* v. *Goodenow*, 24 Mich. 18; *Craig* v. *Bradley*, 26 Mich. 353; *Church* v. *Holcomb*, 45 Mich. 29, 40 (7 N. W. 167).

"Notwithstanding the mistake of law claimed by defendants' solicitors, the court must not pervert nor abrogate plain rules and principles of pleading and practice. The proposed amended answer cannot, therefore, be filed as a pleading in the cause, but it will be permitted to be filed as an offered or proposed answer, so that the Supreme Court may have possession of it in the record; for that court will have the power to grant the amendment on appeal, should it deem it proper.

"3. This brings us to the question of a claimed combination of an efficient responsible agency with a natural irresponsible agency, which it is said caused the damage. Defendants' counsel call attention to the rule laid down by the supreme court of Wisconsin in the somewhat noted case of *Cook* v. *Railway Co.*, 98 Wis. 624 (74 N. W. 561, 40 L. R. A. 457, 67 Am. St. Rep. 830). At page 642, that learned court uses the following language:

"'Where a cause set in motion by negligence reaches to the result complained of in a line of responsible causation, and another cause, having no responsible origin, reaches it at the same time, so that what then takes place would happen as the effect of either cause entirely regardless of the other, then the consequence cannot be said with any degree of certainty to relate to negligence as its antecedent. Requisite intelligent causation necessary to legal liability is wanting, leaving no ground in reason or in law for it to rest upon.'

"That this is good law, and clearly expressed, there can, I think, be no doubt. Upon the question involved complainant's solicitor relies upon the doctrine laid down by the Michigan Supreme Court in the case of *Stone* v. *Lumber Co.*, 59 Mich. 24 (26 N. W. 216). At page 31, that court says:

137 MICH.—33.

" 'The fact that natural causes contribute with the unlawful acts complained of in producing the injury does not relieve from liability to the injured party (citing cases).

" 'The record in this case shows that the annual freshets occurring upon this stream were not of a character to seriously impede the growth of hay upon this marsh, or to prevent its improvement by complainant previous to the erection of this dam.'

"Counsel concur in the position that these cases are distinguishable, and in this I agree. In the Wisconsin case it might well be said that the damage would have resulted had the locomotive been a thousand miles away.

" As counsel for complainant argues:

" 'It could hardly be said that the fire from the locomotive even contributed to the damage, for, without that fire, the fire from the unknown cause would have been just as hot and would have burned just as quickly as the union of the two fires. In that case, how is the court going to say what proportion of the damage, if any, is the human agency responsible for ? In the *Lumber Co. Case* the spring freshets did do some damage, but that damage was increased and augmented by the wrongful act of the defendant, and he was, therefore, not relieved from liability, because he caused a certain degree of damage, which would not otherwise have occurred.'

"I have examined the evidence with great care upon this question, and I am forced to the conclusion that the spring or springs would not and did not produce the injury complained of. While the springs at times rendered the fire hole damp, they did not interfere seriously with the operation of the mill. But the uniting with this dampness of the wrongful acts of the defendants in raising the water in the stream did cause the injury complained of, so that it must be said that the water from the spring or springs was not of a character or quantity sufficient to seriously impede the running of the mill, but that it was the raising and setting back of the water in the stream by the defendants, as complained of, that caused the damage.

"4. This brings us to the final question of damages, if the bill was properly filed. I am satisfied that the lower dam caused most, if not all, of the damage complained of. On page 23 of the testimony appears the following in the testimony of the complainant:

" 'Q. Does raising the water above you interfere with you ?

" 'A. No; just on the lower dam.'

"This is consistent with all of the evidence in the case. In view of the Michigan cases, I think that a perpetual in-

junction should issue as to the use by defendants of the lower dam. *Stone* v. *Lumber Co.*, supra; *Turner* v. *Hart*, 71 Mich. 128 (38 N. W. 890, 15 Am. St. Rep. 243); *Powers* v. *Hibbard*, 114 Mich. 533 (72 N. W. 339).

" The use of the upper dam, except in conjunction with the use of the lower dam, will not cause material injury. It is the holding of the water by the lower dam that has caused the flooding of the mill of complainant. By a clear preponderance of the evidence, it appears that the stream in question has not sufficient capacity or water to admit of the running of logs without the use of dams. If, however, it can be so used without the raising of water by the use of the said lower dam, the defendants will be permitted to avail themselves of such use. Coming to the question of damages, I shall take a conservative view of the evidence. Much of the evidence of complainant is very general, some of it is vague and indefinite, and some of it is exaggerated with reference to data and values.

" On page 56 of the testimony, in answer to the question:

"'When your operations are not impeded by this drive, how much, on an average, do you run your mill in the course of the summer months, in a month, on an average?

"'A. Run her about half of the time.'

" After going over all of the evidence carefully, I have concluded to allow complainant $600 damages for the year 1900, based upon the loss of the use of the mill for 50 days, estimating the cut at 3,000 feet per day, and estimating the profits at $4 per 1,000 feet. In 1901 I shall allow him for 18 days, 3,000 feet per day, profit of $4 per 1,000 feet, or $216. For the year 1902 I estimate 15 days, 3,000 feet per day, profit $4 per 1,000 feet, or $180—making a total of $996. I shall allow no other damages in the case, for the reasons already stated. The complainant may have a decree restraining the defendants from raising the water in the lower dam, and a money decree against the defendants of $996, and may have execution therefor. Complainant may also have and recover his taxable costs in the case.

"Let a decree be prepared accordingly."

The defendants have brought the case here by appeal. They contend (we quote from brief of counsel):

" (1) In refusing to allow defendants to amend their

answer as proposed, and to take further testimony in support of the issues which would be raised thereby.

"(2) In restraining the defendants from raising heads of water upon, and operating their so-called lower dam.

"Did the trial court exercise a sound discretion in refusing to allow defendants to amend their answer? The original answer, found at Record, p. 6, was prepared in reliance, through misapprehension, upon the cases of *Boyd* v. *Conklin*, 54 Mich. 583 (20 N. W. 595, 52 Am. Rep. 831), and other cases, from which it apparently appears to require 20 years in Michigan to acquire title by prescription. We therefore sought to mitigate as far as possible the complainant's claim for damages."

It is insisted that if the original answer and the amended one—

"Be read together, they will not appear inconsistent. If they appeared in the same answer, objection could not be made that the allegations were inconsistent. The allegation from the original answer could well stand in mitigation of damages, and the allegations of the amended answer as a plea in bar. In the first the idea of prescriptive right is not negatived at all. It is simply that the defendants have not and do not wish to exclude the complainant or any person from the use of Devil's creek as a highway to drive his or their logs to market. In the second or amended answer the defendants simply claim the prescriptive right to flood complainant's premises for the purpose of making such creek an available highway to aid in the driving of logs to market. Of course, we concede that the prescriptive right was not pleaded in the original answer, and it constitutes a new defense unquestionably, but we do maintain that the two allegations are not necessarily inconsistent."

It is also insisted a different rule should apply in relation to amending an answer from the one applying to bills of complaint, for the reason that, if the allegations of a bill are not sufficient, the complainant may discontinue, and commence over again; while a defendant, if not permitted to amend, loses his defense entirely. The question of the amount of damages allowed is not argued.

In our view of the case, we shall need to discuss but one feature of it. The question of amendment arose in this

way: The record discloses by a great quantity of proof that complainant was injured by the acts of defendants; that the flooding of the three years in controversy was much more, and continued for a greater length of time, than it had previously done. The defendants produced as a witness John Murphy, who testified as follows:

"I was an officer of the Spalding Lumber Company before the Crawfords went to Cedar river. I am acquainted with Devil's creek. I had the improvements made on that stream in the summer of 1884. I superintended the driving operations of the Spalding Lumber Company to some extent. If we had thought that Devil's creek could be driven without the aid of dams, we would not have built them there. I know the class of timber they are getting out that is coming down that creek. From what I know of driving, and of the class of timber, and the quantities coming down Devil's creek, and get it down to the mouth of the river, I don't think you could drive it there without the dams, for the reason that, in the first place, it is a very small creek, and there is not sufficient water runs into the creek to enable you to drive without the use of dams. Besides, there is a great descent to the creek, and more so than there is to any other creek up in that country. The fall is rapid."

On cross-examination he said:

"I don't think there is water enough at any time in that creek to admit of driving without the aid of dams. You might drive small cedar logs and posts, but you couldn't drive hemlock or pine logs. It takes about as much water, in my judgment, to drive hemlock logs as it does pine, for the reason that you have considerable large hemlock, and they are very heavy floaters. Of course, peeled hemlock, floats lighter than if they are not peeled. I have not driven the creek since 1898. I have been on the stream since then. When I speak of the improvements on the creek, I refer to the two dams in question, the one above and the one below Pluchak's mill. There were no other dams across the stream. We had several breakwaters to confine the water in shoal places from spreading out. The timber was a good deal larger in those days. I think it would take more water to drive it. I am familiar with the creek along there by Pluchak's mill. I don't think the stream at that point would be capable of being driven

without the aid of dams for cedar products and hemlock, logs running 15 to 20 logs to the thousand. At the point of the mill that is not as shoal a place as at other places. It is kind of flat. Below the lower dam is a very shoal place. The flow of the lower dam reaches nearly up there to Pluchak's mill. When the water in the upper dam is let off, the water from the lower dam would not flood quite up there; but it is practically a dead place, more so than it is farther up and down below the lower dam. The ordinary flow of the stream without the use of dams in the spring of the year—the ordinary freshets—would not, I think, overflow that flat ground around Pluchak's mill. There might be water enough right at the mill to carry the forest products in the bed of the stream; but, as I say, above the mill and below the lower dam you couldn't. From the time we built the improvements there, the use of both the upper and lower dams raised the water over the low ground by Pluchak's mill. I continued with the Spalding Lumber Company from the time these dams were built until that company sold out. Driving was done every year upon this stream by me by means of these dams. That resulted in more or less flooding of the premises around Pluchak's mill in that vicinity. That was uniformly so every year—more or less flooding there—as the driving was done with the use of these dams. That was uniformly so. I have been there since Spalding Company sold out.

" *Q.* Was it flooded as much before as since, or more?'

" *A.* The dams were just the same. I have not been there when they were driving. But the dams were just the same, and the flooding would be about the same."

This is all of his testimony given upon the trial, though he had made an affidavit earlier, which it is claimed is inconsistent with his testimony; but we do not need to further refer to it.

The following then occurred:

"At the close of the testimony in open court, and upon the testimony given by the witness John Murphy in open court, solicitor for defendants asked permission to prepare and file an amended answer in the cause and submit the same to the court and solicitor for complainant, together with written argument and brief. Permission was given by the court to solicitor for defendants to prepare and sub-

mit to the court a proposed amended answer. Such proposed amended answer on the part of the defendants was seasonably prepared and submitted to the court and solicitor for the complainant, together with written argument and brief in the cause, and was, by leave of the court, filed herein on the 22d day of June, A. D. 1903, as a proposed amended answer, but was refused as an amended answer in the cause."

It will be observed this application to amend occurred after the testimony was all in, and without any request whatever being made to take further proof. There is not a suggestion in the record that counsel desired in the lower court to put in further testimony. If we consider the amended answer as allowed, and also consider the testimony of Mr. Murphy, which is the only testimony bearing upon that subject, it will be found the defendants have not met the case presented by the complainant. Mr. Murphy's testimony shows he has driven no logs on the stream since 1898, and that he has not been there when they were driving logs since then. Giving his testimony the fullest credence, it fails to meet the testimony of complainant that the flooding during 1900, 1901, and 1902 was much worse, and for a longer period of time, than it had been before.

The decree is affirmed.

The other Justices concurred.