REASON *v.* PETERS.

1. WATERS AND WATERCOURSES — MILLDAMS — FLOWAGE — EVI-
   : DENCE—SUFFICIENCY.

   On a bill to enjoin the maintenance of a milldam at an unlaw-
   ful height, evidence examined, and *held*, to show that com-
   plainant's lands were flowed throughout the year to a greater
   . extent than they ever had been during the ordinary sea-
   sons, and that the water had been raised 20 inches above
   its usual height.

2. SAME—PRESCRIPTIVE RIGHTS — CREATION — CONTINUOUS OCCU-
   PATION. .

   Occupation and use of a right of flowage or pondage, in order
   to create a prescriptive right, must be continuous and unin-
   terrupted whenever necessary in the operation of the power,
   but need not necessarily be constant in the sense of daily oc-
   cupancy or use.

Appeal from Livingston; Miner, J. Submitted April
9, 1907. (Docket No. 32.) Decided June 3, 1907.

Bill by Floyd Reason against Frank M. Peters to en-
join the maintenance of a dam at an unlawful height.
From the decree rendered, both parties appeal. Re-
manded for further proof on the question of damages, un-
less defendant complies with certain conditions.

*Louis E. Howlett*, for complainant.

*William P. Van Winkle*, for defendant.

BLAIR, J. Complainant is the owner of certain farm-
ing lands in the township of Putnam, near the village of
Pinckney, in said township. Defendant is the owner of
a flouring mill property in the village of Pinckney. The
mill was built as a water power mill in 1836, and has been
in operation continuously since that time. The water
power is obtained by damming Portage creek, which

flows in an easterly direction through the village of
Pinckney, and a short distance north of complainant's
land. The dam extends from the west side of the mill in
a westerly and southwesterly direction for about 60 rods,
and its lowest point is the south bank of the race for a dis-
tance of about 150 feet from the mill. The mill stands
about 20 rods east of the highway, running south from
the village of Pinckney. The wasteweir was about 35 or
40 rods west of the mill.

"The greatest strain is on that portion of the dam to-
ward the southwest end. The dam angles, after it passes
the wasteweir, to the south. From the wasteweir to the
mill it runs nearly east and west. There is more strain
upon the dam at that point because it is exposed to the winds
from the west more than any other place, and the great
bulk of the water is right against that part of the dam,
and the embankment is higher there. That was the low-
est point in the ravine through which Portage creek runs,
the natural water bed. The dam is higher at that point
than any other from the surface of the soil. I would
think it was 10 feet high at that point, wholly artificial,
and, as we get farther to the west, the artificial portion of
the dam is not so high. Same condition is true as you go
toward the east. Between the wasteweir and the road
and the bank is not high and runs off nearly on a level for
some distance; then slopes gradually. The greatest
strain on the dam is from the wasteweir to the west end,
and, if the wind blew from the northwest, it would blow
the water over against that portion of the dam.   *   *   *
"Across the east end of the race, near the mill, there is
what we call a ' weed rack,' consisting of a timber about
8 inches by 8 inches in size, and 18 or 20 feet long, laying
across the race from one bank to the other, with slats ·
fastened onto it standing up and down in the water to
catch the weeds that flow down the race. That weed rack
is probably 6 or 8 feet from the engine house, which is a
little building built at the west side of the mill. The race
or pond at that point is probably from 16 to 20 feet wide.
The race was a little narrower at the west end than at the
east end, and at a point where the north and south road
crosses the race it was probably 14 or 16 feet wide.   *   *   *
That wasteweir was opposite the pond, and about 20 rods
west of this north and south highway."

From 1882 to 1888 the mill was owned and operated by Thompson Grimes and Frank D. Johnson. From 1888 to 1895 the property was owned by E. A. Mann, and from 1895 to 1896 by a man of the name of Parmalee. Thomas Birkett purchased the property in 1896 and owned it until 1901, when he sold it to the defendant Peters for $7,000. Birkett rented the property to one Klem in July, 1896, who operated it until the following spring, since which time until the sale to the defendant the mill was operated by Robert Erwin. The pond extends westerly from the dam about 1½ miles, and the southerly bank is about 20 rods north of complainant's land.

Between complainant's land and the pond is a highway running east and west next north of his land, and then a strip of marsh, called in the record the "Haze marsh." The marsh at the point where it enters complainant's land becomes narrow and extends across the northeast part of the parcel, then broadens out on Monk's farm, lying next east of complainant's land, finally turning back upon the south end of complainant's land. In the piece of marsh next to the highway, called the "front marsh," there are some six or seven acres, and in the other piece, called the "back marsh," some seven or eight acres. These two pieces of marsh are connected with that portion of the marsh upon Monk's land, which consists of from 11 to 15 acres, making about 30 acres in the whole marsh on these two farms.

The mill was fitted for operation by steam after E. A. Mann went in. The mill was overhauled and a double set of rollers put in in 1883, "and in 1886 or 1887 put in full roller process." The dam broke away under Klem, and under Erwin, about two years later. The dam also gave way under defendant.

"That was the first year I bought the property, four years ago last summer. Then there was a break in the dam just west of the wasteweir, and it went out for the length of about 40 feet on the top and sloping down to the bottom, and that we filled in with earth and drew

dirt between that break and the cemetery hill on top of the dam. Don't think we raised the dam at that time any from what it usually was."

On the 11th day of August, 1905, complainant filed his bill of complaint, alleging that within the last 10 years the dam has at different times been repaired and likewise the wasteweir, and at each time of making repairs thereto the said dam and the said wasteweir therein has been built higher than it had been built before, the result being that it has caused the water in the said stream to rise higher in the pond and to cause the waters thereof to flood more land than it had formerly done; "that, until recently, none of the land described as belonging to your orator was flooded because of damming the said creek;" that since the repairs have been made in the last five or six years on the said dam and the said wasteweir a portion of the said lands are continually flooded and under water, rendering at least 10 acres of said parcel as wholly unfit for cultivation and of no value; that a large part of the remainder is kept wet and of less value for farming purposes; that a few weeks ago it became apparent to the owner that the dam and wasteweir were in need of further repairs, the water in the said pond was permitted to flow through the said wasteweir for the purpose of enabling them to make said repairs; that at the present time the defendant is engaged in making the said repairs; and that the wasteweir is wholly out, and that the defendant is about to place a new one therein, and—

"As your orator is informed and believes, is intending to build the said dam and the said wasteweir to such a height as to get a head of water as high as it has been during the last two or three years and about three or four feet higher than it had been raised at any period of the mill's history until within the last six or seven years; that if the defendant is permitted to build the dam and wasteweir to the height that he intends to build it that it will flood a large part of your orator's land herein described, and do him irreparable injury."

The answer denied all the material allegations of the bill, and averred—

"The truth to be that none of said land has been flooded because of damming said creek recently more than it was flooded for the period of 50 years and upward."

It is conceded that whatever rights of flowage the defendant possesses have been acquired by prescription, and the principal question of fact in the case was whether complainant's lands had been flowed to a greater extent during the 9 or 10 years preceding the filing of the bill than during the period theretofore. Upon this issue much conflicting testimony was taken. The circuit judge, after personally viewing the premises, in company with the parties and their attorneys, found—

"That the milldam proper had been raised at different times so that at the present time it is somewhat higher than it was some years ago, but that portion of the milldam where the race is itself had not been materially raised to exceed three or four inches, or six inches at the outside, but it appeared to the court that the water had raised and had flowed back on the lands of the complainant to a greater extent than it used to. It seemed to me that this was caused from two or three causes combined. In the first place, in the last few years, we have had unusual wet seasons, and there had been a large amount of water turned into the millpond from the adjacent country; that, during that time, I think two different drains have been dug into the creek or stream that empties into the millpond, thereby causing a very large amount of water to flow into the stream, and the evidence on the part of the complainant and on the part of the defendant, or especially on the part of the defendant, shows this state of facts: That on former occasions, former years and during the spring when the snow was melting or during spring freshets, as it is called, the water would flow back on the land of the complainant, but as the spring freshet passed away it would recede, and during the balance of the year the land in question would be used for pasture land. But it would seem that during the last three or four years, at least, that the water has been kept up at spring height, you might call it, all the time. For instance, at the time I was there, which was in February, I think, the water

was back upon the land in question to quite a depth, I should think at least two feet, and the ditch that was formerly dug from this marsh into the millpond, the water did not run either way down near the highway under the culvert, showing that the water itself on this land in question was of the same height as the water in the millpond. * * *

"In this case, if the only question was as to whether this land had been overflowed at the same amount at the present time, that it was in the springtime, I should decide in favor of the defendant, but I think the evidence, and the weight of the evidence, in fact, the great weight of the evidence upon the part of the defendant even, is that this land has not been overflowed in its present condition only for a small portion of the year during the spring months or during the time when there was a heavy freshet previous to nine years ago. * * *

"If I remember correctly, when I visited the place, and I think the evidence showed that, the flashboards came within a foot and a half from the top, and I think the court will decree that the defendant be required to lower those flashboards 15 inches and to continue them lower from the 1st day of April to the 1st day of December of each year, and that the complainant recover his costs to be taxed. In this case I should have given a decree of damages instead of compelling the defendant to lower the flashboards, but there was not sufficient evidence introduced in the case on either side to warrant me in giving a decree in that respect. The only evidence that was given in the case was on the part of the complainant, who claimed his damages were some $700, and from my observations of the premises I do not think that he was entitled to it."

A decree having been entered in accordance with the findings of the court, both parties have appealed to this court.

The preponderance of the evidence in this case supports the claim of complainant that the waters of the pond have overflowed his lands to a greater extent since 1896 than theretofore. Complainant and Mr. Monks (who owned the 80 next east), and who were in a situation to know more about their own lands than others who did not occupy them, testified that they never knew the water from

the pond to back up onto their land until Mr. Klem oper-
ated the mill.   Mr. Monks testified:

"I remember when Mr. Klem went into the mill, be-
tween 9 and 10 years ago.   Up to that time the water had
never stood back upon this 80 of mine, except it might be
in this way:   In the spring of the year and heavy waters,
there might be some water lay on my land for a day or
two, when it thawed up in the spring of the year.   That
would be water that flowed down from the land south.
My marsh on my 80 is a part of the same marsh as the
two pieces upon Reason's.   *   *   *

" I have known the land on the Reason marsh as many
years as I have mine.   Up to nine years ago I have
known the marsh on the south end of the Reason 80 to be
mowed different years.   I never knew that to be covered
with water throughout the season up to nine years ago.
Up until the last few years I never knew the water to
stand back from the pond upon the piece of marsh upon
the north end of the Reason 80; never did up to the time
that Klem went into the mill.   That marsh was always
dry just about the same as mine."

This testimony is well supported by the testimony of
other disinterested witnesses; by the flooding of complain-
ant's well, theretofore on hard land; the dying of trees,
and the rise of water under bridges.   The correctness of
this testimony is also strongly supported by the testimony
of Mr. Birkett, defendant's grantor.   Birkett testified:

"At one time when I owned the mill, Mr. Reason came
to me in reference to the water on these marshes.   He
made a proposition to me in regard to putting in a drain
from these marshes underneath the pond, and thence
through the dam.   He thought that by so doing he could
build a dam across the neck, which was quite narrow, I
don't think more than 20 feet, and put that pipe through,
so that water coming down from his marsh could be piped
under the dam, so there couldn't be any back water from
the dam onto his.   After thinking the matter over and
talking it over with him, I see the theory was correct.
*   *   *

" He was going to take a great deal of pains.   I see he
did, and he put it in good shape and that was all right.
I think it worked successfully in a reasonable stage of
water as long as they kept up the dam.   *   *   *

"The dam went out while I owned it, west of the highway, near the middle. I repaired it and built it up some higher than it had been before. I remember when Mr. Klem was in the mill he carried the water higher than it had been before, and I remonstrated with him from time to time, and I asked Barney Lynch to let me know if he continued to carry the water dangerously high. Lynch could at any time tell the height of the water in the pond by the depth of the water in his cellar. Klem went into the mill in the fall of '96. Reason never complained to me about the water being on his land until the time we were repairing the dam. That was the next season after Klem went into the mill. Then he came to me and told me that the water stood back from the pond upon his land. I told him Klem had been in the habit of carrying the water too high, and that I remonstrated with him on that account. I don't remember that Reason also told me that the water backed up onto Monk's, but I understood from him that from the height to which Klem carried the water it backed up onto their land, so there was this arrangement made between Reason and me, whereby they were to put in the tile to take off this surface water and they were to build this little dam. These tile were to run along the edge of the pond, through the dam and out into the wasteweir below the dam. The tile were put in while the water was down in the pond at the time we were repairing the dam after it went out for Klem. I am quite certain the joints of these tile were not cemented together. Reason proposed to put in a little dam on the edge of the pond to keep the water from backing up on their land. I built the dam two or three feet higher than it was when I found it. You see the trouble is it was low and the northwest wind sweeps the length of it and brings the water there. We had to raise that; put stone in front of the dam to protect that part of it, the west end, and no other part, only that that is exposed to the northwest wind. * * *

"It was never carried as high as the time Klem carried April 19, 1897. That was Sunday night, and it was almost a cyclone from the northwest, and he carried it just as full as it could hold, and, of course, it drove down and washed the dirt off and when it once got to going away the whole business went."

Mr. Frank Johnson testified:

"I couldn't say what portion of the time we had a 14-

foot head when I was operating the mill. We tried to keep it up there all the time we could. In the spring of the year when we had plenty of water, we would let it run over the wasteweir. In the spring when the water was coming in plenty, we would let it run off so as to be safe, but as the rains and water began to die away we would keep it up as near 14 feet as we could because we needed the water."

There was also evidence that the south bank of the race at the lowest point in the dam had been raised from four to six inches by depositing coal ashes there. Mr. Johnson testified that the south bank was not raised at this point while he owned the mill.

"If there are any ashes on the surface of that dam now on the south bank, then it is higher to the depth of those ashes than it was in 1883."

Mr. E. A. Mann testified that he did not remember of any ashes being put on this bank while he was there.

"If there were any there, it would raise the bank to that extent."

Complainant and Mr. Pennington testified the last day of the hearing that they dug down into this bank at several spots, 15 feet apart, and found, under an inch or so of soil, coal ashes, ranging from four inches at the east end to six inches at the west end. This testimony is undisputed. Since 1895, therefore, when Mann sold out, the dam has been raised from two to three feet, and probably more, on the west end, and from four to six inches at the lowest point in the south bank of the race. While the raising of the dam at the west end would not affect the ponding capacity of the dam, it would affect the height at which the water could be safely carried, and especially during spring floods, with high winds to drive the water against this portion of the dam. Again, during the time that Johnson and E. A. Mann were operating the mill, they were obliged to use steam power to help out the water power, while since Birkett owned the mill it has been operated by water power alone, and "it took more

power to operate the mill after the roller process was put in than it did before." The raising of the dam affected the height of water which could be safely carried in the spring and fall as well as in the summer. If the dam to the west of the wasteweir were at the same level with the lowest point of the south bank of the race, the water could not be carried near to the top of the race bank without endangering the dam, as experience demonstrated. If the dam near the wasteweir were raised sufficiently high to withstand the assaults of the wind and waves, the race could be carried nearly bank full with safety.

As the first flooding of complainant's lands by the waters of the pond in 1896 was occasioned by Klem carrying the water at an unusual and dangerous height, it is reasonable to suppose that, with a higher dam, defendant's carrying the water at an unusual height has caused the flooding for the years since the little dam was destroyed. The evidence as to the head of water at the mill or the lowest point in the dam is not very satisfactory. No levels or exact measurements appear to have been taken, either at the mill or elsewhere. The defendant testified that there was 13 feet and 8 inches head when he bought the mill. Birkett testified:

"The race bank on the south side isn't more than 6 inches higher than the 14 feet. I have had the water in the race high enough so it would trickle over the south bank. That point is the lowest point in the entire dam, and there is a good stiff sod there, so the water wouldn't cut in. The race bank was never changed any, or raised, to my knowledge. I have been there since I owned the mill, and, as far as I could see, the banks are the same and the flume is the same. While I say that 14 or 15 feet was the highest head or high water mark, I would think if it was lowered to 11 or 12 feet running head that would be about the lowest that they could hold it and do business. I think that about 12 feet running head would be the limit, so that I put the limit between high and low running head at approximately 2 feet. If you get below that, you couldn't successfully operate the mill. During the time I owned the mill it was operated during all the

months of the year and during the time they had sufficient water it was kept up to 14 feet head. In dry times the water would go down, and then in seasons of more rain or wetter times, the water would be held up again."

The extent of the right of flowage by prescription is not measured by the height of the dam but by the extent of the use of the lands flowed, and the burden of proving the extent of such use—

"Is upon the defendants to show that they have for a period of 15 years, at least, each year flowed complainants' lands to the height complained of and established by their proofs, and that such use of complainants' lands by flowage has been adverse, uninterrupted, peaceable, open and notorious." *Turner* v. *Hart*, 71 Mich. 128.

See, also, *Chapel* v. *Smith*, 80 Mich. 100; *Osten* v. *Jerome*, 93 Mich. 196; *A. P. Cook Co.* v. *Beard*, 108 Mich. 17; *Pluchak* v. *Crawford*, 137 Mich. 509.

"Occupation and a use of a right of flowage or pondage, in order to create a prescriptive right, need not be constant in the sense of a daily occupancy or use. It must be continuous and uninterrupted, but not necessarily constant. It is necessarily an irregular use, depending upon season and rainfall; and it is sufficient if the use be the ordinary use and be resorted to without interruption whenever necessary in the operation of the power." *Cornwell Manfg. Co.* v. *Swift*, 89 Mich. 503.

The ordinary use must be determined by the ordinary season. Fluctuation in the height of the water caused either by extraordinary rainfalls or freshets would not enlarge the right, nor would fluctuation caused by unusual drouths diminish the right. *Allen* v. *Electric Co.*, 144 Mich. 370; *Johnson* v. *Boorman*, 63 Wis. 268. The defendant failed to show by a preponderance of the evidence that he was not flowing complainant's land to a greater extent than it had previously been flowed each year for 15 consecutive years with the ordinary use of the milldam during ordinary seasons, and the complainant, in our opinion, did prove, by a preponderance of the evidence, that his lands were flowed throughout the year to a

greater extent than they ever had been during the ordinary seasons, and that the water has been raised 20 inches above its usual height.

In view of the limited extent of the injury and the number affected who have a right to complain, its character, the comparative values of the properties, and other considerations presented by the record, we agree with the circuit judge that a decree for such damages as complainant has and will in the future suffer in consequence of defendant's acts would be more appropriate to this case than a decree to lower the dam or permanently remove flashboards. We also agree that complainant's damages were considerably overestimated by him, both in his bill of complaint and in his testimony, and that there is no satisfactory basis in this record for determining the amount of such damages.

Under the circumstances, we think it best to remand the record to the circuit court for the taking of further testimony as to complainant's permanent damages, unless defendant prefers to reduce the ponding capacity of the dam, by removal of flashboards, 20 inches, in which event complainant's damages will be the rental value of the lands wrongfully overflowed and injured by such overflow for the period defendant has overflowed them, and a decree will be entered in the circuit court as the case may then appear. Complainant will recover costs of this court.

McALVAY, C. J., and CARPENTER, GRANT, and OSTRANDER, JJ., concurred.